**Gary STEINER and Rodney Shields, Plaintiffs,**

v.

**HERCULES INC., David S. Hollingsworth, Fred L. Buckner, Arden B. Engerbretsen, George MacKenzie, and Edward J. Sheehy, Defendants.**

**Civ. A. No. 90–442–RRM.**

United States District Court, D. Delaware.

Sept. 24, 1993.

Pamela S. Tikellis, Carolyn D. Mack, Chimicles, Burt, Jacobsen & McNew, Wilmington, DE, Nicholas E. Chimicles, Chimicles, Burt, Jacobsen & McNew, Haverford, PA, Daniel W. Krasner, Peter C. Harrar, Edward P. Dietrich, Wolf Halderstein Adler Freeman & Herz, New York City, for plaintiffs.

Thomas R. Hunt, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE, H. Robert Fiebach, Neil S. Witkes, Jay A. Dubrow, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for defendants.

## TABLE OF CONTENTS

I. FACTUAL BACKGROUND 775
   A. Nature of the Action 775
   B. Class Certification 775
   C. The Plaintiffs' Allegations and the Course of the Litigation 775

D.  The Settlement Negotiations ....... 777
E.  The Notice of the Settlement Agreement ....... 777
F.  The Hearing on the Settlement Agreement ....... 777
G.  Counsels' Application for an Award of Attorneys' Fees ....... 777
    1.  Greenfield & Chimicles' Application for an Award of Fees ....... 777
    2.  Wolf Haldenstein Adler Freeman & Herz's Application for an Award of Fees ....... 779
    3.  Allocation of Work Done ....... 781
H.  Counsels' Application for a Reimbursement of Expenses ....... 781
    1.  Greenfield & Chimicles' Application for a Reimbursement of Expenses ....... 781
      a.  $21,386.99 for travel, food and lodging ....... 781
      b.  $52,338.16 for postage/express mail; telephone, telecopy, photocopying by the firm and messenger/courier ....... 781
      c.  $13,417.22 for other office expenses ....... 782
      d.  $77,838.23 for other out of pocket expenses and for services and materials provided to the firm, including filing fees, photocopying, deposition transcripts, and subpoena services ....... 782
      e.  $228,840.45 for professional services ....... 782
      f.  $377,764.48 for expert witness fees ....... 783
      g.  $32,749.62 for notice costs and partial nominee reimbursement ....... 783
    2.  Wolf Haldenstein Adler Freeman & Herz's Application for Reimbursement of Expenses ....... 784
      a.  $39,411.35 for travel, food, and lodging ....... 784
      b.  $23,911.75 for postage/express mail, telephone/telecopy, photocopying by the firm, and messenger/courier ....... 784
      c.  $13,545.31 for other office expenses ....... 785
      d.  $46,349.72 for other out of pocket expenses and for services and materials provided to the firm, including court fees, photocopying, deposition transcripts, process servers and witness fees ....... 785
      e.  $171,158.72 for professional services ....... 786
      f.  $4,123.34 for notice costs ....... 786

II.  DISCUSSION ....... 786

  A.  Attorneys' Fees ....... 786
    1.  Hours Worked ....... 786
    2.  Rates ....... 786
    3.  Multiplier ....... 789
      a.  contingent nature of the fee ....... 789
      b.  quality of the work ....... 790
      c.  determination of an appropriate multiplier ....... 790
      d.  the percentage of recovery method for determining fees ....... 791
  B.  Reimbursement of Expenses ....... 792
    1.  Greenfield & Chimicles ....... 792
      a.  $21,386.99 for travel, food, and lodging ....... 792
      b.  $52,338.16 for postage/express mail, telephone, facsimile, photocopying by the firm and messenger/courier ....... 793
      c.  $13,417.22 for other office expenses ....... 793
      d.  $77,838.23 for other out of pocket expenses and for services and materials provided to the firm, including filing fees, photocopying, deposition transcripts, and subpoena services ....... 793
      e.  $228,840.45 for professional services ....... 793
      f.  $377,764.48 for expert witness fees ....... 794
      g.  $32,749.62 for notice costs and partial nominee reimbursement ....... 794
      h.  summary ....... 794
    2.  Wolf Haldenstein Adler Freeman & Herz ....... 794
      a.  $39,411.35 for travel, food, and lodging ....... 794
      b.  $23,911.75 for postage/express mail, telephone/facsimile, photocopying by the firm, and messenger/courier ....... 795
      c.  $13,545.31 for other office expenses ....... 795

    d.   $46,349.72 for out of pocket expenses and for services and materials provided to the firm, including court fees, photocopying, deposition transcripts, process servers, and witness fees   795

    e.   $171,158.72 for professional services   796

    f.   $4,123.34 for notice costs   796

    g.   summary   796

  C.  Interest on Payments From the Fund   796

## OPINION

McKELVIE, District Judge.

On May 4, 1993, the Court entered an Order approving the settlement of this case, a class action in which the plaintiffs alleged the defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b–5 thereunder, 15 U.S.C. § 78j(b), and Section 20(a) of the Exchange Act, 15 U.S.C.S. § 78t(a). Under the Settlement Agreement, the defendants paid $17,250,000 into an escrow account to be available for distribution to the class members and to pay fees and costs incurred on behalf of the class.

Plaintiffs' counsel, Nicholas E. Chimicles and members of the law firm of Greenfield & Chimicles [1], Haverford, Pennsylvania, and Daniel W. Krasner and members of the law firm of Wolf Haldenstein Adler Freeman & Herz, New York, New York, have applied for an award of attorneys' fees and reimbursement of expenses from that fund. This is the Court's decision on the application.

## I. FACTUAL BACKGROUND

### A. Nature of the Action

The plaintiffs in this case are Gary Steiner and Rodney Shields. The defendants are Hercules Incorporated ("Hercules"); David S. Hollingsworth, former Chairman of the Board and Chief Executive Officer of Hercules; Fred L. Buckner, former President and Chief Operating Officer of Hercules; Arden B. Engebretsen, former Vice–Chairman of the Board and Chief Financial Officer of Hercules; George MacKenzie, Vice President, Controller of Hercules; and, Edward J.

Sheehy, former President of Hercules Aerospace Company.

In a complaint filed on February 21, 1990, and amended on April 11, 1991, the plaintiffs alleged they purchased Hercules common stock during the period from March 6, 1989, through January 19, 1990. They contend that during that period the price of the stock was inflated artificially as a result of false and misleading public statements made in: (a) filings by Hercules with the Securities and Exchange Commission ("SEC") (including Forms 10–K and 10–Q); (b) press releases by Hercules; and, (c) the presentations by certain of the individual defendants to securities analysts relating to the status of, alleged cost overruns in, and risks associated with the Titan IV SRMU (Solid Rocket Motor Upgrade), Delta II GEM (Graphite Epoxy Motor), and SRAM II (Short–Range Attack Missile) missile system programs of Hercules.

### B. Class Certification

In December of 1990, the Court granted the plaintiffs' motion and entered an Order determining that this matter should be maintained as a class action, with the plaintiffs as representatives of the class of all persons, other than the defendants, who purchased Hercules common stock during the period from March 6, 1989, through January 19, 1990. After publication of notice, certain persons elected to exclude themselves from the class.

### C. The Plaintiffs' Allegations and the Course of the Litigation

In their Amended Complaint, the plaintiffs alleged that after the New York Stock Ex-

---

[1]. During the period between the dates of the application and this decision the law firm of Greenfield & Chimicles split into two firms: Chimicles, Burt, Jacobsen and McNew; and, Richard D. Greenfield & Partners.

change closed for the day on Friday, January 19, 1990, Hercules announced it was taking a pre-tax charge to earnings in the fourth quarter of 1989 by setting up a reserve of $323 million. Hercules attributed the charge to "problems" associated with its Aerospace Division's contracts, including its Delta II GEM and SRAM II contracts, as well as its contract with Martin Marietta Corporation to develop SMRUs for the Titan IV satellite launch vehicle.

The plaintiffs further contend that during the period from March 6, 1989, the date Hercules filed its 1988 10–K with the SEC, to the January 19, 1990 announcement, the defendants misrepresented and failed to disclose alleged cost overruns and the status of risks associated with these missile programs. For example, at the Company's 1989 Annual Meeting of Shareholders on March 28, 1989, defendant Hollingsworth reported that, based in substantial part on Aerospace's contribution, Hercules was expecting to generate for its investors an 11 to 12 percent return on equity, with a return in "the mid teens ... [a]s full production levels are reached in major production contracts in Aerospace...." *See* Plaintiffs' Amended Complaint, Docket Item 106, ("D.I. __") ¶ 80.

The plaintiffs contend Hercules' common stock was trading as high as $52.25 per share in early September of 1989 and that it closed at $37.75 on January 19, 1990 and $36.13 on January 22, 1990.

During the two and one half years the parties were in the discovery phase of this litigation, the plaintiffs undertook extensive discovery. In response to the plaintiffs' requests, the defendants produced over 1,000,-000 pages of documents, 100 microfiche cards and three to four boxes of test films. The plaintiffs took over 30 depositions, with a number of them taking up to two, three and four days to complete. In addition to this discovery from Hercules, the plaintiffs also reviewed documents and took testimony from non-party witnesses, such as the United States Air Force, Martin Marietta and Hercules' accountants, Coopers & Lybrand.

Eventually, the plaintiffs came to focus their litigation efforts on a method of accounting Hercules had adopted for its Titan IV contracts. The plaintiffs allege that Hercules avoided taking large write-offs on its Aerospace missile programs, particularly on the Titan IV SMRU program, by using what is known under Generally Accepted Accounting Principles ("GAAP") as the "combined contract" method of accounting.

The plaintiffs contend that under the terms of its contract with Martin Marietta, Hercules was to develop up to 39 shipsets (or pairs of motors) of the Titan IV SMRU for firm fixed prices, with established ceiling and target prices. As the contract involved a new product and new technology, it had development and qualification, and production phases. Although Hercules had received firm orders for only 15 of the 39 shipsets, under the combined contract method of accounting, it amortized its development and qualification costs as if it had received a firm commitment for the entire 39 shipsets.

Under the American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 81–1, *Accounting for Performance of Construction-type and Certain Production-type Contracts*, two or more contracts may be grouped together and treated as a single profit (or loss) center for reporting purposes *only* if certain criteria are met. These criteria relate to the nature of the contracts involved, the environments in which the contracts are negotiated and performed, and the time intervals between the negotiation and execution of the first and subsequent contracts that are to be combined. The plaintiffs contend it was not appropriate for Hercules to use the combined method of accounting, as it did not have a binding contract for the additional 24 shipsets. They argue that using the combined method of accounting allowed Hercules to avoid disclosing that there were massive overruns in these amortized costs.

The plaintiffs retained two experts to assist them in preparing for trial, an accounting expert, Patrick McGeehin of Rubino & McGeehin, and a damages expert, John B. Torkelson of Princeton Venture Research ("PVR"). The defendants designated six experts to testify on a number of matters including accounting, government contracts,

contract costs and schedule estimating, and damages.

### D. *The Settlement Negotiations*

At the close of discovery in December of 1991, plaintiffs moved for a partial summary judgment that Hercules' lack of a binding agreement for the purchase of more than 15 shipsets precluded its use of combined contract accounting for the Titan IV program at year end 1988.

The case was reassigned to this Judge on March 31, 1992, while the parties were in the process of completing briefing on the motion. On July 14, 1992, the Court met with counsel for a scheduling conference, set the case for a jury trial beginning on January 11, 1993, and scheduled a settlement conference for July 21, 1992. After a series of conferences, counsel wrote to the Court in November of 1992 to report they had reached an agreement in principle on a settlement.

### E. *The Notice of the Settlement Agreement*

The parties filed the Stipulation of Settlement on February 9, 1993. *See* D.I. 192. In addition to providing for the establishment of the escrow account, the agreement also provided plaintiffs' counsel would apply for an award of fees and reimbursement of expenses from the account, with plaintiffs' counsel agreeing not to seek an award of legal fees, exclusive of expenses, in excess of thirty percent of the $17,250,000 settlement amount, which is $5,175,000.

Pursuant to the Court's Order, plaintiffs' counsel caused notice of the proposed settlement to be mailed to the Class and to be published in The Wall Street Journal. That notice informed members of the Class of the terms of the proposed settlement and that the Court would hold a hearing on its terms on May 3, 1993. The notice also informed the class members of their right to file objections and to appear at the hearing.

No one filed an objection to the terms of the proposed settlement.

On April 27, 1993, plaintiffs' counsel submitted an application for an award of fees and reimbursement of expenses pursuant to the terms of the proposed settlement, and submitted with the application certain information on the basis for the amounts sought. After reviewing their submission, the Court wrote to counsel to suggest they consider submitting certain additional information in support of the application.

### F. *The Hearing on the Settlement Agreement*

On May 3, 1993, the Court held a hearing on the proposed settlement and at that hearing counsel offered additional information in support of the application. No member of the class appeared to question or object to the terms of the proposed settlement.

Following the hearing, the Court entered an Order approving the terms of the settlement and dismissing the claims in the litigation on the merits, but reserving jurisdiction for the purpose of administering and enforcing the Settlement Agreement and to resolve the application for an award of attorneys' fees and reimbursement of expenses.

### G. *Counsels' Application for an Award of Attorneys' Fees*

Nicholas E. Chimicles and Daniel W. Krasner have jointly applied for an order awarding their firms from the total settlement fund, $5,175,000, plus interest, in fees.

#### 1. *Greenfield & Chimicles' Application for an Award of Fees*

By an affidavit and a supplemental affidavit, Chimicles and Michael D. Donovan have submitted to the Court copies of Greenfield & Chimicles' chronological computer record of time entries recorded by each attorney, law clerk, and paralegal who worked on the matter. The records are printed out by year, with the work done by each person described by date, time spent in increments of fifteen minutes, and a brief description of the nature of the work done.

Chimicles has submitted a summary sheet that identifies each person who recorded billable time on the matter, separates the nature of the work done into nine basic categories (e.g. research/briefs or discovery/fact analysis), sets out total billable hours for each person, a current billable rate for that per-

son, and a total of that person's billable hours multiplied by that rate. *See* D.I. 214. The summary lists approximately 50 persons who recorded billable time on the matter. It includes partners at the firm with rates ranging from $450.00 per hour for Richard Greenfield, to $375.00 for R. Bruce McNew, $325.00 for Pamela S. Tikellis and $250.00 for Michael D. Donovan. The associates' rates range from $250 an hour for a senior associate, to $125 an hour for a new associate. The firm's rates for law clerks range from $125 an hour to $90 an hour, and its rates for paralegals range from $90 an hour to $35 an hour. While a number of professionals worked on the matter over the years, it appears from the billing records that the bulk of the work on the matter was done by Chimicles, Donovan, Ira Richards and three paralegals, Dana Campanaro, Lavinia Fadden, and Loretta Irwin. Chimicles has included with his affidavit a brief biographical statement describing the education and professional experience of each billing professional.

The total billable time in the firm's application is 7,922.00 hours. At the current billable rates the estimated fee for the firm based on time would be $1,455,168.75. The following table summarizes information submitted by the firm:

| Person | Status | Year graduated from law school | Total Hours | Current Rate | Requested Lodestar |
|---|---|---|---|---|---|
| Richard Greenfield | Partner | 1965 | 48.00 | $450.00 | $ 21,600.00 |
| Nicholas Chimicles | Partner | 1973 | 745.00 | 400.00 | 298,000.00 |
| C. Oliver Burt, III | Partner | 1967 | 4.00 | 400.00 | 1,600.00 |
| R. Bruce NcNew | Partner | 1979 | 2.00 | 375.00 | 750.00 |
| Kenneth Jacobsen | Partner | 1979 | 3.00 | 375.00 | 1,125.00 |
| Pamela Tikellis | Partner | 1982 | 95.25 | 325.00 | 30,956.25 |
| James Malone, Jr. | Partner | 1984 | 1.00 | 265.00 | 265.00 |
| Michael Donovan | Partner | 1984 | 1,056.25 | 250.00 | 264,062.50 |
| Lisa Rodriguez | Partner | 1983 | 1.00 | 250.00 | 250.00 |
| Brenda Nelson | Of Counsel | 1983 | 5.25 | 275.00 | 1,443.75 |
| Jeffrey Spangler | Associate | 1978 | 343.25 | 250.00 | 85,812.50 |
| Miles Rittmaster | Associate | 1980 | 0.25 | 235.00 | 58.75 |
| John Paul Gignac | Associate | 1986 | 0.25 | 225.00 | 56.25 |
| Candice Hegedus | Associate | | 36.25 | 225.00 | 8,156.25 |
| Francis Farina | Associate | 1983 | 0.25 | 225.00 | 56.25 |
| Mark Rifkin | Associate | 1987 | 0.50 | 225.00 | 112.50 |
| Carolyn Mack | Associate | 1984 | 37.75 | 225.00 | 8,493.75 |
| Wendy Zoberman | Associate | 1984 | 0.25 | 225.00 | 56.25 |
| Ira Richards | Associate | 1986 | 2,025.00 | 205.00 | 415,125.00 |
| James Strum | Associate | 1986 | 1.25 | 205.00 | 256.25 |
| Steven Schwartz | Associate | 1987 | 2.75 | 200.00 | 550.00 |
| Katherine Balon | Associate | n/a | 0.25 | 200.00 | 50.00 |
| Christopher Reyna | Associate | 1986 | 104.00 | 195.00 | 20,280.00 |
| Robert Kriner | Associate | 1988 | 1.25 | 190.00 | 237.50 |
| Clifford Rones | Associate | n/a | 0.25 | 185.00 | 46.25 |

| Person | Status | Year graduated from law school | Total Hours | Current Rate | Requested Lodestar |
|---|---|---|---|---|---|
| Michael Gottsch | Associate | 1983 | 1.00 | 185.00 | 185.00 |
| M. Katherine Meermans | Associate | 1982 | 6.50 | 185.00 | 1,202.50 |
| Robin Resnick | Associate | 1986 | 57.75 | 185.00 | 10,683.75 |
| Edward Seglias | Associate | | 57.50 | 130.00 | 7,475.00 |
| Eugene Tompkins | Associate | | 295.50 | 125.00 | 36,937.50 |
| Courtney Crowley | Law clerk | | 0.75 | 125.00 | 93.75 |
| Charles Briglia | Law clerk | | 1.00 | 100.00 | 100.00 |
| Stephanie Tsantes | Law clerk | | 54.50 | 90.00 | 4,905.00 |
| Lisa Chanow | Law clerk | | 67.50 | 90.00 | 6,075.00 |
| Christine Till | Law clerk | | 530.25 | 90.00 | 47,722.50 |
| Neal Wilson | Law clerk | | 298.00 | 90.00 | 26,820.00 |
| Christopher Wasson | Law clerk | | 6.00 | 90.00 | 540.00 |
| Eric Raundenbush | Law clerk | | 52.75 | 90.00 | 4,747.50 |
| John Kowit | Law clerk | | 47.75 | 90.00 | 4,297.50 |
| Steven Bravato | Paralegal | | 8.00 | 90.00 | 720.00 |
| Charles Cipolla | Paralegal | | 55.75 | 90.00 | 5,017.50 |
| Cassandra Hirsch | Paralegal | | 196.25 | 85.00 | 16,681.25 |
| Diane Oakes | Paralegal | | 37.25 | 85.00 | 3,166.25 |
| Bronwen Scott | Paralegal | | 19.75 | 75.00 | 1,481.25 |
| Emma Larson | Paralegal | | 8.75 | 75.00 | 656.25 |
| Amy Hinze | Paralegal | | 8.00 | 75.00 | 600.00 |
| Dana Campanaro | Paralegal | | 543.00 | 75.00 | 40,725.00 |
| Lavinia Fadden | Paralegal | | 242.50 | 75.00 | 18,187.50 |
| Marsha Figurelli | Paralegal | | 5.00 | 75.00 | 375.00 |
| Jennifer Corchiolo | Paralegal | | 18.25 | 75.00 | 1,368.75 |
| Mary Stephenson | Paralegal | | 3.25 | 75.00 | 243.75 |
| Amy Handel | Paralegal | | 0.75 | 75.00 | 56.25 |
| Loretta Irwin | Paralegal | | 778.50 | 70.00 | 54,495.00 |
| John Iorio | Paralegal | | 6.00 | 35.00 | 210.00 |
| Total | | | 7,922.00 | | $1,455,168.75 |

### 2. *Wolf Haldenstein Adler Freeman & Herz's Application for an Award of Fees*

In support of Wolf Haldenstein Adler Freeman & Herz's application for an award of fees, Daniel W. Krasner has submitted to the Court copies of a computer printout with data showing billable time organized by person for the time period, with a billable rate at the time the entry was made, the time

worked recorded by the tenth of an hour, the amount to be billed, and a brief description of the nature of the services performed.

Krasner has also submitted a summary sheet that identifies each person who recorded billable time on the matter, separates the nature of the work done into six basic categories (e.g. research/briefs or discovery/fact analysis), sets out billable hours for each person, a current billable rate for that person, and a total of that person's billable hours multiplied by that rate. *See* D.I. 224 at Exhibit C. The summary lists approximately 26 persons who recorded billable time on the matter. It includes partners at the firm with current rates ranging from $415 per hour for Krasner to $275 per hour for Peter C. Harrar. The associates' rates range from $210 to $150 an hour. The firm's rate for paralegals is $95 an hour. While a number of professionals worked on the matter over the years, it appears from the billing records that the bulk of the work was done by Krasner, Harrar, Edward P. Dietrich, an associate, and Jacob Davidson and William Scapell, paralegals. Harrar submitted an affidavit in support of the application which included a brief biographical statement describing the education and professional experience of each billing professional.

The total billable time in the application is 6,326.95 hours. At the current billable rates the estimated fee for the firm based on time would be $1,221,776.50. The following table summarizes information submitted by the firm:

| Person | Status | Year graduated from law school | Total Hours | Current Rate | Requested Lodestar |
|---|---|---|---|---|---|
| Daniel Krasner | Partner | 1965 | 662.70 | $415.00 | $275,020.50 |
| Fred Isquith | Partner | 1971 | 1.1 | 395.00 | 434.50 |
| Eric Levine | Partner | 1977 | 1.6 | 235.00 | 376.00 |
| Jeffrey Smith | Partner | 1978 | 26.0 | 350.00 | 9,100.00 |
| Frank Gregorek | Partner | 1978 | 11.5 | 325.00 | 3,737.50 |
| David A.P. Brower | Partner | 1982 | 55.6 | 325.00 | 18,070.00 |
| Peter C. Harrar | Partner | 1984 | 1,553.7 | 275.00 | 427,432.50 |
| Edward Dietrich | Associate | 1986 | 913.95 | 210.00 | 191,929.50 |
| Neil Zola | Associate | 1990 | 23.0 | 150.00 | 3,450.00 |
| Michelle Lopes | Paralegal | | 151.0 | 95.00 | 14,345.00 |
| Ann Marie Lastella | Paralegal | | 27.8 | 95.00 | 2,641.00 |
| Jeffrey Hartman | Paralegal | | 8.5 | 95.00 | 807.50 |
| Richard Chase | Paralegal | | 0.3 | 95.00 | 28.50 |
| Roger Smith | Paralegal | | 4.5 | 95.00 | 427.50 |
| Alison Dickard | Paralegal | | 48.0 | 95.00 | 4,560.00 |
| Jacob Davidson | Paralegal | | 733.0 | 95.00 | 69,635.00 |
| William Scapell | Paralegal | | 1,946.6 | 95.00 | 184,927.00 |
| Xavier Macias | Paralegal | | 42.6 | 95.00 | 4,047.00 |
| Traci Turner | Paralegal | | 22.0 | 95.00 | 2,090.00 |
| William Janss | Paralegal | | 3.8 | 95.00 | 361.00 |
| Alec Miller | Paralegal | | 6.7 | 95.00 | 636.50 |
| James Ko | Paralegal | | 52.0 | 95.00 | 4,940.00 |
| Lynn Halpern | Paralegal | | 21.5 | 95.00 | 2,042.50 |

| Person | Status | Year graduated from law school | Total Hours | Current Rate | Requested Lodestar |
|---|---|---|---|---|---|
| Adam Greenfield | Paralegal | | 4.0 | 95.00 | 380.00 |
| Joseph Chung | Paralegal | | 1.5 | 95.00 | 142.50 |
| Jennifer Trulock | Paralegal | | 4.0 | 95.00 | 380.00 |
| Total | | | 6,326.95 | | 1,221,776.50 |

### 3. *Allocation of Work Done.*

At the May 3, 1993, hearing on the proposed settlement, Chimicles reviewed the arrangement the firms had reached on a division of the work to be done in the case. For example, he reported and their time records confirm: Greenfield & Chimicles worked on the Titan IV and SRAM II issues; Wolf Haldenstein worked on the Delta II issues; and Greenfield & Chimicles took the depositions of senior Hercules personnel, while Wolf Haldenstein focused on non-party witnesses such as Coopers & Lybrand, the Air Force, McDonnell Douglas, and Martin Marietta.

With regard to expert witnesses, Greenfield & Chimicles focused on the damages experts, while Wolf Haldenstein focused on the accounting experts.

### H. *Counsels' Application for a Reimbursement of Expenses.*

Chimicles and Krasner have also submitted affidavits in support of their firms' applications for a reimbursement of approximately $1,101,387.50 in out of pocket expenses incurred in connection with the litigation.

### 1. *Greenfield & Chimicles' Application for a Reimbursement of Expenses*

Greenfield & Chimicles seeks $804,335.15 for expenses incurred in this matter. They include the following:

| Category | Amount |
|---|---|
| Postage | $ 1,963.44 |
| Telephone/telecopy | 1,853.92 |
| Travel, food, lodging | 21,386.99 |
| Photocopying—outside | 41,854.48 |

| | |
|---|---|
| Photocopying—firm | 38,972.25 |
| Messenger/courier | 9,548.55 |
| Clerical overtime | 6,011.14 |
| LEXIS/computer research | 6,870.56 |
| Deposition transcripts | 34,925.45 |
| Filing fees | 145.00 |
| Subpoena service | 913.30 |
| Legislative research services of Jonathan Cuneo | 5,756.40 |
| Financial services of Howard, Lawson | 30,000.00 |
| Accounting services of Rubino & McGeehin | 193,084.05 |
| Damages analysis of Princeton Venture Research | 377,764.48 |
| Notice costs and partial nominee reimbursement | 32,749.62 |
| Publications | 160.12 |
| Copies of SEC materials | 336.19 |
| Misc. office expenses | 39.21 |
| **TOTAL** | **$804,335.15** |

### a. *$21,386.99 for travel, food and lodging*

Chimicles has submitted with his affidavit copies of receipts, expense summaries, and invoices for out of pocket travel, food, and lodging expenses of $21,386.99. As he notes in his supplemental declaration, D.I. 222, and as the receipts confirm, a large portion of these expenses are related to trips to Salt Lake City, Los Angeles, and Denver for depositions and document review. The hotel accommodations appear to be at moderate rates and the airline travel is at coach class.

### b. *$52,338.16 for postage/express mail, telephone, telecopy, photocopying by the firm and messenger/courier*

Chimicles reports that his firm seeks reimbursement for the following office related expenses: $1,963.44 for postage and express

mail; $1,853.92 for telephone and telecopy expenses; $38,972.25 for in-firm photocopying; and $9,548.55 for messenger/courier. The firm keeps records for these items on a firm-wide basis for all active cases and the amounts are entered monthly from a combined print-out of costs for all cases. The expenses are then assigned to the individual cases for which they have been incurred.

These items are reported on certain of the firms monthly billing reports. Chimicles has not, however, provided the underlying documentation that identifies the individual expenses or services incurred. Nor has he identified rates at which these items are billed. He has not, for example, identified the rate charged per page for photocopying or the estimated number of pages copied.

### c. *$13,417.22 for other office expenses*

The firm seeks reimbursement for the following out of pocket office expenses: $6,011.14 for clerical overtime; $6,870.56 for LEXIS/computer research; $160.12 for publications; $336.19 for copies of SEC materials; and $39.21 for miscellaneous office expenses.

Chimicles has attached to his affidavit copies of the daily record of overtime reports and night staff typing requests which show the nature of the work done and the clerical time involved. It appears that frequently the overtime work was typing of deposition digests and internal memoranda for the attorneys.

He has also attached a computer printout summarizing the basis for the LEXIS/computer research billing for the period from November of 1990 through April of 1991. The total billings for this period appear to be in the range of $2,500. By combining the information in this billing with the information in the professional staff's billing records, it appears that the majority of the time for this computerized research was associated with gathering background information on the NEXIS informational service.

Chimicles has also submitted copies of invoices for publications and miscellaneous expenses incurred by the firm, such as the cost of labels.

### d. *$77,838.23 for other out of pocket expenses and for services and materials provided to the firm, including filing fees, photocopying, deposition transcripts, and subpoena services*

The firm also seeks reimbursement for the following out of pocket expenses: $145.00 for filing fees; $41,854.48 for photocopying provided to the firm; $34,925.45 for deposition transcripts; and $913.30 for service of subpoenas.

Chimicles has attached to his affidavit copies of the invoices for photocopying provided to the firm, including invoices from this Court's Clerk's Office, invoices from nonparty witnesses that provided documents in discovery, and invoices from professional copying services. He has also provided invoices for copies of deposition transcripts and discs as well as invoices detailing the amount billed to the firm by firms who served discovery subpoenas.

### e. *$228,840.45 for professional services*

The firm seeks $228,840.45 to cover the cost of services provided by consultants in three areas. First, the firm seeks $5,756.40 as the amount billed by the Law Offices of Jonathan W. Cuneo for research and consultations on the status of defense authorization bills, including for conversations with congressional staff and obtaining copies of documents. The majority of this amount is for time spent by attorneys at the rates of $250 and $275 an hour in April and December of 1991 and August and September of 1992. It appears Greenfield & Chimicles has not paid this bill.

Second, the firm seeks $30,000 to pay Howard, Lawson & Co., $27,745 for professional services and $2,255.00 for expenses. Greenfield & Chimicles has paid $15,000 of this amount. Chimicles reports that the balance is payable irrespective of the result of this application. In his supplemental affidavit in support of the application, Chimicles offered the following information on the nature of these services:

At the request of my Firm and its client, Rodney B. Shields, H & L prepared an extensive pre-suit report on the financial condition of Hercules Aerospace and other

subsidiaries. This report was forwarded to Hercules management so that it could explore ways to enhance shareholder value and better manage the Company, in particular the Aerospace Division. This report was also useful in our initial investigation of the case and preparation of the Complaint. After suit was filed, H & L prepared a very preliminary damages analysis based in part on information they had accumulated from H & L's earlier report. The damages analysis also drew upon research as to the number of Hercules shares available for public trading, an analysis of comparable companies and how their stock prices reacted to news announcements similar to those made by Hercules. Because H & L was unable to act as a testifying damages expert, it was replaced by Princeton Venture Research (PVR) very shortly after the case was filed (mid–1990). H & L's work was not duplicated by, but instead was conveyed to, PVR, so that the substitution of a damage expert did not cause the plaintiffs' counsel (or the Class) to incur any unnecessary cost of duplication.

Howard, Lawson & Co.'s invoice is dated April 27, 1993 and sets out in summary that the fee for services rendered is $27,745 and the amount of expenses incurred is $2,255. It does not identify the hours spent, the billing rates, or the specific expenses incurred.

The third billing for professional services identified by Greenfield & Chimicles is $193,-084.05 for accounting advice and services provided by Rubino & McGeehin. Chimicles reports that Rubino & McGeehin assisted plaintiffs' counsel with the interpretation and application of accounting Statement of Position 81–1. The firm performed work only as instructed by plaintiffs' counsel and provided billing on a monthly basis. Greenfield & Chimicles paid the $193,084.05 in full on a current basis as it was billed.

Chimicles has provided with his affidavit copies of Rubino & McGeehin's monthly bills, which include a summary statement, a more detailed computer printout with an identification of the billing professional, the hourly billing rate, the billable time recorded and expenses incurred, and a supplemental information statement describing the work done.

### f. $377,764.48 for expert witness fees.

Greenfield & Chimicles seeks $377,764.48 for fees and costs incurred by Princeton Venture Research. In support of this expense, Chimicles has delivered to the Court a single page summary prepared by PVR that identifies approximately twenty persons who recorded billable time on the matter, identifies the total time each person billed (ranging from a high of approximately 650 hours to a low of approximately 19 hours), and sets out their hourly rates for billing, ranging from $350 per hour to $70 per hour. The total fees sought are $371,770.00. PVR's out of pocket expenses are identified by category and total $5,994.48. Chimicles reports that his firm has paid $115,000 of the total billed by PVR.

Chimicles has also submitted an affidavit from Candace Preston, Executive Vice President of PVR. Preston reports that the nature of the services rendered by PVR on this matter included: (1) reviewing Hercules' financial statements and price and volume data for Hercules' stock during the class period as well as for comparable companies in related businesses; (2) recomputing Standard & Poor's Aerospace/Defense and Chemical Industry indexes, excluding Hercules, to determine the extent Hercules' stock was affected by industry factors; (3) performing a computer analysis of the trading of Hercules' stock by institutional shareholders; and (4) computing damages using the trading volume for Hercules' stock adjusted for specialist transactions and program trades, the computed true value for the stock, assuming proper disclosure, and a computer trading model.

### g. $32,749.62 for notice costs and partial nominee reimbursement

Greenfield & Chimicles also seeks $32,-749.62 as a reimbursement for amounts paid in connection with notices relating to this action. Chimicles has provided with his affidavit copies of the invoices associated with these expenses, including invoices for printing class notices and the publication of those notices in the Wall Street Journal.

### 2. *Wolf Haldenstein Adler Freeman & Herz's Application for a Reimbursement of Expenses*

Wolf Haldenstein seeks $297,052.39 [2] for expenses incurred in this matter. They include the following:

| Category | Amount |
| --- | --- |
| Accounting services of Rubino & McGeehin | 171,158.72 |
| Court costs | 137.25 |
| Express mail | 3,609.98 |
| Process service | 610.00 |
| Messenger/courier | 99.50 |
| On line computer | 3,455.18 |
| Research services—disclosure | 311.95 |
| Photocopying | 38,977.54 |
| Postage | 8.80 |
| Staff overtime | 9,778.18 |
| Deposition transcripts | 22,142.38 |
| Travel, food, lodging | 39,411.35 |
| Telephone/telecopy | 3,028.22 |
| Witness fees | 200.00 |
| Notice to the class | 4,123.34 |
| TOTAL | 297,052.39 |

#### a. *$39,411.35 for travel, food, and lodging*

Krasner has submitted with his affidavit copies of invoices, receipts, and vouchers for out of pocket travel, food, and lodging expenses of $39,411.35. The receipts are organized chronologically and by trip. As Krasner notes in his affidavit, and as the receipts confirm, a large portion of these expenses are related to trips to Salt Lake City, Denver, and Los Angeles for depositions and document review. In addition, an attorney and a paralegal spent three to four weeks in Philadelphia at the offices of Greenfield & Chimicles indexing, reviewing, and summarizing documents produced in this matter. Attorneys from the firm also made many trips to Philadelphia and Wilmington in connection with discovery matters, settlement negotiations, and court conferences. The airline travel is at coach class and, with some exceptions, the hotel accommodations appear to be at moderate rates.

#### b. *$23,911.75 for postage/express mail, telephone/telecopy, photocopying by the firm, and messenger/courier*

Krasner reports that his firm seeks reimbursement for the following office related expenses: $8.80 for postage; $3,609.98 for express mail; $3,028.22 for telephone and telecopy expenses; $17,165.25 for in-firm photocopying; and $99.50 for messenger/courier.

Krasner has not described the nature of the relatively insignificant postage expense. The request for $3,609.98 for express mail services consists of $3,539.98 in recorded disbursements, plus $70.00 to cover expected costs through the settlement date. Krasner has submitted copies of invoices for the express mail costs incurred through March 31, 1993. He notes in his affidavit, and the invoices confirm, that most of these charges were incurred between January and May of 1991, when plaintiffs' counsel was engaged in written and deposition discovery which required that documents be dispatched overnight.

In his affidavit, Krasner notes the request for $3,028.22 as reimbursement for telephone and telecopy expenses consists of $2,993.22 incurred through February 25, 1993, plus $35.00 to cover expected costs through the settlement date. Krasner has submitted copies of the firm's bookkeeping entries related to these expenses. However, those entries appear to show telephone and telecopy costs in the amount of $514.44, not $3,028.22.

In support of the request for $99.50 to cover messenger/courier expenses, Krasner has submitted copies of invoices showing messenger deliveries to various locations within New York City. The cost of these deliveries ranged from $8.75 to $20.95. He has not identified the reason his firm incurred these messenger expenses.

The request for $17,165.25 in photocopying costs consists of $16,915.25 in copying costs incurred through April 12, 1993 (the firm charges $.25 per copy and copied 67,661 pages related to this matter), and an estimated $250.00 (1000 pages) for photocopying costs related to the settlement hearing that had not yet been downloaded from the counter machines in the firm's copiers.

---

**2.** In his affidavit, Krasner identifies the total amount of expenses sought by his firm as $297,037.39, however, it appears the listed expenses total $297,052.39.

**c.** *$13,545.31 for other office expenses*

The firm seeks reimbursement for the following out of pocket office expenses: $9,778.18 for staff overtime; $3,455.18 for on-line computer costs; and $311.95 for other research services.

Krasner reports that the overtime expenses include the following disbursements: $3,071.54 for overtime payments to secretaries; $1,402.37 for meal expenses for attorneys, paralegals, and secretaries who worked overtime; and $3,804.27 for taxicab or car services used by attorneys, paralegals and secretaries who worked overtime. In support of these expenses, he has submitted copies of overtime authorization forms for secretarial overtime, petty cash requisition slips for overtime meal expenses, and receipts from car service companies and taxicabs. The total of these expenses is $8,278.18, not $9,778.18 as requested by the firm.

In support of the firm's request for $3,455.18 for on-line computer costs, Krasner has submitted copies of invoices from the Dow Jones News Retrieval Service and the Mead Data Central LEXIS/NEXIS service along with copies of the firm's bookkeeping entries related to these charges. The firm used these services primarily for gathering factual information on Hercules and the government contract industry. The firm also used LEXIS for research and cite-checking related to briefing on discovery and summary judgment motions. The firm seeks reimbursement of 150 percent of its on-line computer expenses in order to recoup overhead items such as monthly subscription charges, sales tax, and telephone usage charges.

The firm seeks $311.95 for other research related expenses. In support of this request, the firm has submitted an invoice for $37.89 to obtain a transaction report for trades of Hercules' common stock on January 19, 1990, and an invoice for costs incurred to obtain full text copies of Hercules' SEC filings which is difficult to read, but appears to be

for $229.38. Accordingly, the firm has submitted documents supporting $267.27, not $311.95, for other research related expenses.

**d.** *$46,349.72 for other out of pocket expenses and for services and materials provided to the firm, including court fees, photocopying, deposition transcripts, process servers, and witness fees*

The firm seeks reimbursement for the following out of pocket expenses: $137.25 for court costs; $23,260.09 for photocopying provided to the firm; $22,142.38 for deposition transcripts; $610.00 for process server costs; and $200.00 for witness fees.

Krasner has attached to his affidavit requisition forms for checks to be made payable to various courts. Included among these expenses are filing fees in the United States District Court for the Southern District of New York, subpoena fees in the United States District Court for the District of Maryland, and photocopying fees in the United States District Court for the District of Utah.

The requested $23,260.09 [3] for photocopying services provided to the firm breaks down as follows: $4,196.52 paid to Attorney's Photo, an outside copying service; $5.60 paid to the New York City Bar Association; $17,860.17 paid to Greenfield & Chimicles to reimburse it for copying costs incurred in connection with document production; and $1,197.80 paid to Merrill Lynch for reproduction of documents produced pursuant to a subpoena. In support of this request for reimbursement, Krasner has submitted petty cash requisition slips, invoices from Attorney's Photo, an invoice from Merrill Lynch, a check from the firm for $15,813.38 made payable to Greenfield & Chimicles, and bookkeeping entries for the firm showing photocopying expenses charged to this matter. The check to Greenfield & Chimicles is accompanied by a letter indicating that $11,749.53 of the $15,813.38 total was for Wolf Haldenstein's share of certain photocopying expenses. The firm has not provided support for photocopying expenses paid to

---

**3.** The firm requests $23,260.09 as reimbursement for outside photocopying expenses and $17,165.25 for in-house photocopying expenses for a total of $40,425.34. On its summary of

expenses, however, the firm reports that it seeks a total of $38,977.54 as reimbursement for photocopying expenses.

Greenfield & Chimicles other than the $11,749.53 mentioned in the letter.

In support of the remaining office expenses, Krasner has provided invoices for copies of deposition transcripts, for discovery subpoenas, and for witness fees.

### e. *$171,158.72 for professional services*

The firm seeks $171,158.72 for accounting advice and services provided by Rubino & McGeehin. As Chimicles has submitted a summary of the work performed by Rubino & McGeehin and copies of their monthly bills, the Wolf Haldenstein firm has not duplicated that submission. Instead, the firm has submitted copies of checks it paid to Rubino & McGeehin or Greenfield & Chimicles for services rendered by Rubino & McGeehin.

### f. *$4,123.34 for notice costs*

The firm also seeks $4,123.34 as reimbursement for amounts paid in connection with notices prepared to advise potential class members of the pendency of this case. Krasner has provided copies of the invoices for printing and reprinting these notices.

## II. DISCUSSION

### A. Attorneys' Fees

In their joint application, plaintiffs' counsel request an attorneys' fees award of $5,175,000, or 30 percent of the $17.25 million settlement amount.

■ In class actions, attorneys who create a "common fund" for the benefit of the class are entitled to recover reasonable fees and expenses from that fund. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 165 (3d Cir.1973) ("*Lindy I* "). In *Lindy I* and *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir.1976) ("*Lindy II* "), the United States Court of Appeals for the Third Circuit set forth the guidelines for computing the value of attorneys' services for the purpose of setting an attorneys' fee award in common fund cases. First, the Court determines the "lodestar" by multiplying the number of hours reasonably spent on the case by a reasonable hourly rate of compensation for each attorney who worked on the case. Second, the Court may, in its discretion, adjust the "lodestar" by a multiplier to reflect the contingent nature of the litigation, the difficulty of the issues involved, and the quality of the attorneys' work.

### 1. Hours Worked

■ As outlined above, the time spent and nature of the work done by plaintiffs' counsel has been identified with reasonable particularity. For each billing professional who worked on the matter, the plaintiffs' counsel has identified his or her educational background and professional skills, the time he or she spent on the matter in quarter of an hour intervals (tenth of an hour intervals for Wolf Haldenstein), and a description of the nature of the work he or she performed. The work performed by plaintiffs' counsel has been described with sufficient particularity that the Court is comfortable reviewing and evaluating its quantity and quality. The Court finds that the work performed by the attorneys and staff of the law firms of Greenfield & Chimicles and Wolf Haldenstein was reasonably necessary for the preparation and presentation of the plaintiffs' case. Furthermore, with the billing information provided, the Court has some sense of the efficiency of the billing professional and the quality of the work he or she has done. In general, it appears the work was done efficiently and the work product contributed to the plaintiffs' cause.

### 2. Rates

■ In determining the "reasonable hourly rate" by which plaintiffs' counsel should be compensated, the Court looks to the "prevailing market rates in the relevant community." *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *In re Fine Paper Antitrust Litig.,* 751 F.2d 562, 591 (3d Cir.1984).

Greenfield & Chimicles has submitted some information in the form of a declaration by a partner in the firm comparing Greenfield & Chimicles' hourly rates to the hourly rates charged in certain Philadelphia, New York, and Los Angeles firms. *See* Declaration of James R. Malone, Jr., in Support of

Application for an Award of Attorneys' Fees at D.I. 227A. At the May 3, 1993 hearing, Chimicles identified the firms referred to in Malone's summary. *See* the transcript of the hearing, D.I. 227, at page 33. Malone's survey shows the following:

Senior Partners

| | |
|---|---|
| Philadelphia Firm A (Berger & Montague) | $385.00–$500.00 |
| Philadelphia Firm B (Kohn, Nast & Graf) | $375.00–$425.00 |
| New York Firm A (Abby & Ellis) | $450.00 |
| Philadelphia Firm C (Barrack, Rodos & Bacine) | $335.00–$350.00 |

Mid–Level Partners

| | |
|---|---|
| Philadelphia Firm A (Berger & Montague) | $325.00–$335.00 |

Junior Partners

| | |
|---|---|
| Philadelphia Firm A (Berger & Montague) | $285.00 |
| Philadelphia Firm C (Barrack, Rodos & Bacine) | $295.00 |

Senior Associates

| | | |
|---|---|---|
| Philadelphia Firm A (Berger & Montague) | 1985 Graduate | $285.00 |
| | 1986 Graduate | $225.00 |
| Philadelphia Firm C (Barrack, Rodos & Bacine) | 1988 Graduate | $180.00 |
| Philadelphia Firm D (Wolf, Block) | 1988 Graduate | $190.00 |
| Philadelphia Firm E (Schnader, Harrison, Segal & Lewis) | 1988 Graduate | $165.00 |
| Los Angeles Firm A (Baker & Mackenzie) | 1985 Graduate | $210.00 |
| | 1986 Graduate | $205.00 |

Junior Associates

| | | |
|---|---|---|
| Philadelphia Firm A (Berger & Montague) | 1989 Graduate | $180.00 |
| | 1991 Graduate | $165.00 |
| Philadelphia Firm D (Wolf, Block) | 1989 Graduate | $185.00 |
| Philadelphia Firm E (Schnader, Harrison, Segal & Lewis) | 1989 Graduate | $150.00 |
| Los Angeles Firm A (Baker & Mackenzie) | 1989 Graduate | $160.00 |
| | 1990 Graduate | $145.00 |
| | 1991 Graduate | $130.00 |

Paralegal Rates

| | |
|---|---|
| Philadelphia Firm A (Berger & Montague) | $ 90.00–$110.00 |
| Philadelphia Firm C (Barrack, Rodos & Bacine) | $ 90.00 |
| Philadelphia Firm E (Schnader, Harrison, Segal & Lewis) | $ 75.00 |

---

Wolf Haldenstein has not submitted any additional information on this issue, beyond the identification of the rates at which it bills its professionals' time.

With the record as it has been developed by the parties, it is difficult for the Court to determine whether or not the rates proposed by these firms reflect the prevailing market rates in the community. For the purposes of this decision, the Court is prepared to accept the assumption that the relevant community we should be looking to is the national legal community that practices securities litigation. The Court also appreciates that the schedules of rates charged by the firms in this case are themselves some information on what the prevailing rates are in the market place. While the survey information provided by Greenfield & Chimicles is of some help in testing whether or not the rates are consistent with the market, it does not really

provide a reliable yardstick. The survey does not appear to be based on a large enough sample of firms, does not have comprehensive information from each firm on comparable categories of professionals, and only provides what may be the most helpful baseline information (year of graduation) for one group of billing professionals.

The Court's sense is that the rates sought by counsel in this case are a little high. While there may be additional sources of information by which the Court might test the reasonableness of the rates sought by counsel, the Court is not inclined to make findings on these market rates independent from the record submitted by counsel. Instead, 'the Court will make certain modest adjustments to the rates sought by comparing the schedules submitted by the two firms, and measuring them against the yardstick of the information in the Malone survey.

Those adjustments are as follows:

1. *Attorneys.* Based on the Greenfield & Chimicles' fee schedule, and on the information in the survey on rates charged by attorneys who graduated in similar years, the proposed rates for Edward Dietrich, class of 1987, $210 per hour and Peter C. Harrar, class of 1984, $275.00 per hour, appear to be out of line with the market and the Court will adjust the rates for the fee award downward to $195.00 and $250.00 respectively.

2. *Paralegals.* Greenfield & Chimicles' schedule shows that it bills its paralegals at rates ranging from $35.00 to $90.00 an hour, while Wolf Haldenstein appears to bill all of its paralegals at one rate, $95.00 an hour. The Court will adjust the Wolf Haldenstein rate for paralegals to $75.00 an hour as a blended rate.

The Court will calculate the lodestar for Greenfield & Chimicles using its fee schedule as submitted, and will calculate the lodestar for Wolf Haldenstein with these adjustments. The lodestar for Greenfield & Chimicles is, therefore, $1,455,168.75. The adjusted lodestar for Wolf Haldenstein is $1,107,668.70. The adjustments leading to this awarded lodestar are summarized in the following chart:

| Person | Status | Year graduated from law school | Total Hours | Current Rate | Awarded Rate | Requested Lodestar | Awarded Lodestar |
|---|---|---|---|---|---|---|---|
| Daniel Krasner | Partner | 1965 | 662.70 | $415.00 | $415.00 | $ 275,020.50 | $ 275,020.50 |
| Fred Isquith | Partner | 1971 | 1.1 | 395.00 | 395.00 | 434.50 | 434.50 |
| Eric Levine | Partner | 1977 | 1.6 | 235.00 | 235.00 | 376.00 | 376.00 |
| Jeffrey Smith | Partner | 1978 | 26.0 | 350.00 | 350.00 | 9,100.00 | 9,100.00 |
| Frank Gregorek | Partner | 1978 | 11.5 | 325.00 | 325.00 | 3,737.50 | 3,737.50 |
| David A.P. Brower | Partner | 1982 | 55.6 | 325.00 | 325.00 | 18,070.00 | 18,070.00 |
| Peter C. Harrar | Partner | 1984 | 1,553.7 | 275.00 | 250.00 | 427,432.50 | 388,425.00 |
| Edward Dietrich | Associate | 1986 | 913.95 | 210.00 | 195.00 | 191,929.50 | 178,220.25 |
| Neil Zola | Associate | 1990 | 23.0 | 150.00 | 150.00 | 3,450.00 | 3,450.00 |
| Michelle Lopes | Paralegal | | 151.0 | 95.00 | 75.00 | 14,345.00 | 11,325.00 |
| Ann Marie Lastella | Paralegal | | 27.8 | 95.00 | 75.00 | 2,641.00 | 2,085.00 |
| Jeffrey Hartman | Paralegal | | 8.5 | 95.00 | 75.00 | 807.50 | 637.50 |
| Richard Chase | Paralegal | | 0.3 | 95.00 | 75.00 | 28.50 | 22.50 |
| Roger Smith | Paralegal | | 4.5 | 95.00 | 75.00 | 427.50 | 337.50 |
| Alison Dickard | Paralegal | | 48.0 | 95.00 | 75.00 | 4,560.00 | 3,600.00 |
| Jacob Davidson | Paralegal | | 733.0 | 95.00 | 75.00 | 69,635.00 | 54,975.00 |

| Person | Status | Year graduated from law school | Total Hours | Current Rate | Awarded Rate | Requested Lodestar | Awarded Lodestar |
|---|---|---|---|---|---|---|---|
| William Scapell | Paralegal | | 1,946.6 | 95.00 | 75.00 | 184,927.00 | 145,995.00 |
| Xavier Macias | Paralegal | | 42.6 | 95.00 | 75.00 | 4,047.00 | 3,195.00 |
| Traci Turner | Paralegal | | 22.0 | 95.00 | 75.00 | 2,090.00 | 1,650.00 |
| William Janss | Paralegal | | 3.8 | 95.00 | 75.00 | 361.00 | 285.00 |
| Alec Miller | Paralegal | | 6.7 | 95.00 | 75.00 | 636.50 | 502.50 |
| James Ko | Paralegal | | 52.0 | 95.00 | 75.00 | 4,940.00 | 3,900.00 |
| Lynn Halpern | Paralegal | | 21.5 | 95.00 | 75.00 | 2,042.50 | 1,612.50 |
| Adan Greenfield | Paralegal | | 4.0 | 95.00 | 75.00 | 380.00 | 300.00 |
| Joseph Chung | Paralegal | | 1.5 | 95.00 | 75.00 | 142.50 | 112.50 |
| Jennifer Trulock | Paralegal | | 4.0 | 95.00 | 75.00 | 380.00 | 300.00 |
| Total | | | 6,326.95 | | | 1,221,776.50 | 1,107,668.75 |

In summary, the Court finds that, based on the record created by counsel, the lodestar the Court will look to for the purpose of determining a reasonable fee to be awarded from the fund for Greenfield & Chimicles is $1,455,168.75, and the lodestar for Wolf Haldenstein is $1,107,668.75. The combined lodestar is, therefore, $2,562,837.50.

### 3. *Multiplier*

Plaintiffs' counsel ask that the Court adjust the lodestar figures upward to a combined total fee of $5,175,000, or 30 percent of the settlement fund, to reflect the contingent nature of the fee and the quality of their work. Using the lodestar counsel had proposed would call for a multiplier of 1.93 times the fees sought by the firms. With the Court's adjustment to Wolf Haldenstein's lodestar, the multiplier sought to obtain a fee of $5,175,000, would be 2.019 times the lodestar.

Here is a brief review of the factors the Court looks to in evaluating this request.

### a. *contingent nature of the fee*

■ In considering the contingent nature of the fee, the Court looks to: (1) the complexity of the factual and legal issues in the case; (2) the probability of defendants' liability; (3) the difficulties regarding proof of damages; (4) the risks assumed in developing the case; and (5) the delay in receipt of payments for services rendered. *Lindy II,* 540 F.2d at 117.

■ Having considered these factors, the Court finds for a number of reasons that plaintiffs' counsel are entitled to an upward adjustment of their "lodestar" for the contingent nature of success in this case. First, the pleadings in this case raised difficult and complex factual and legal issues that counsel actively pursued for a substantial period of time.

Second, at the time counsel took on this matter, the probability of defendants' liability was uncertain. The record presented to the Court suggests that it took a substantial investment of time and effort by counsel to pull together the facts necessary to be prepared to present their claims. In addition, the briefing on the plaintiffs' motion for a partial summary judgment suggests that defendants intended to vigorously contest plaintiffs' contentions as to whether or not the facts developed by counsel would establish a basis for liability.

Third, the record suggests the counsel had undertaken a difficult and complex task in attempting to prove the appropriate level of damages to be recovered. Plaintiffs' experts

had apparently been prepared to testify to estimated damages of up to $85 million; the defendants experts expected to testify to estimated damages in a range of $4 million to $30 million. It appears the agreement on a $17.25 million settlement was a fair and reasonable compromise that reflects real value that was added to the plaintiffs' claims through plaintiffs' counsels' time, effort and hard work.

Finally, because this was a difficult and contested matter, in agreeing to take this case on a contingent fee basis, plaintiffs' counsel assumed a substantial risk they might not have gotten paid for their services. For the three years that they worked to bring this matter to a resolution, plaintiffs' counsel spent a substantial amount of time and money on the case. That time and the out of pocket expenses that they incurred, significantly increased their investment in this matter and the potential losses at risk associated with that contingency.

### b. *quality of the work*

It appears from the record available to the Court that plaintiffs' counsel worked hard to achieve the results they obtained for their clients. Their written work demonstrated a good working familiarity with the facts and law. Their briefing and presentations at oral argument were thoughtful, well organized and persuasive. These skills and the compensation for them are, however, reflected in counsels' hourly rates.

■ Among the factors the Court should consider in evaluating the quality of plaintiffs' counsels' work for the purpose of fixing on a multiplier, are the results obtained, *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 168 (3d Cir.1975), and counsels' efficiency in working to obtain those results. *Prandini v. National Tea Co.*, 557 F.2d 1015, 1019–20 (3d Cir.1977). If counsel obtain a good result with a minimum of time expended, the Court may use a higher multiplier in recognition that counsels' efficiency should not work to their disadvantage and result in a lower fee. On the other hand, this Court will be inclined to use a lower or negative multiplier to the extent it appears that counsel have not worked to maximize the efficiencies in representing their clients.

■ In this case, counsel were not able to obtain an early settlement. Nor does the record suggest that they were particularly efficient or inefficient in the work they performed. Consequently, the Court is not inclined to find that counsels' efficiency or inefficiency should be a factor that influences a decision on the selection of a multiplier.

On the other hand, the amount of the settlement obtained by counsel and the ratio of that amount to the lodestar suggests that the Court should apply a positive multiplier to the lodestar figure. That is, while the lodestar of $2,562,837.45 is substantial, it is less than fifteen percent of the $17.25 settlement recovered by counsel. In light of the ratio of the lodestar to the value obtained, the Court is inclined to use a positive multiplier to increase the compensation to counsel and to award them a larger percentage of the benefit they have obtained for their clients.

### c. *determination of an appropriate multiplier*

■ On balance, these two factors, the contingent nature of the representation and the quality of the work as measured by the results obtained, suggest that the Court should apply a positive multiplier to the lodestar.

In support of their initial request for a multiplier in the range of 1.93, plaintiffs' counsel cite several class action securities cases where courts have applied multipliers at or above that number. *See, e.g., Hinckley v. E.I. Du Pont de Nemours and Co.*, 583 F.Supp. 11 (E.D.Pa.1983) (multiplier of 3.0); *In re First Jersey Sec. Litig.*, No. 681, slip op. at 16, 1989 WL 69901 (E.D.Pa. June 23, 1989) (multiplier of 2.15); *In re Avon Products Inc. Sec. Litig.*, [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,061, at 94,699, 1992 WL 349768 (S.D.N.Y.1992) (multiplier of 2.13); *In re American Integrity Sec. Litig.*, [1989–1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,738, at 93,382, 1989 WL 89316 (E.D.Pa.1989) (multiplier of 2.5 for lead counsel and 2.1 for other counsel). *See also* 3 H. Newberg, *Newberg on Class Actions* 14–4 (3d ed. 1992) (finding multipliers in the range

from one to four are frequently awarded in common fund cases).

In this case, the Court looks to three factors to find that the multiplier should be lower than the number suggested by counsel. First, because this case was not settled early, counsel have had to invest quite a bit of time in this matter. That investment has lead to a lodestar that will in itself produce a substantial recovery for counsel. That substantial recovery reduces the risk that the lodestar does not fairly reflect the value of counsels' services. Second, as noted above, because of the nature of the record on the fee application, the Court has accepted as a lodestar a number that is relatively high and that appears to have provided a generous starting point for beginning the analysis on an appropriate multiplier. Third, because of the amount of the lodestar, there is a risk that a high multiplier would lead to a total fee that is unreasonably high, both as an absolute number and in relation to the benefit obtained by counsel for their clients.

In light of these factors, the Court finds that a more reasonable figure for a multiplier would be a number that provides some additional compensation to counsel to reflect both the contingent nature of their representation and the relative value of the benefit obtained. The Court has settled on 1.65 as a multiplier that accomplishes those ends, as it increases the lodestar by a substantial amount (both as a percentage and in absolute dollars) and provides additional compensation to reflect the value of the benefit obtained. At the same time, a multiplier of 1.65 is not so high that it provides unreasonably high compensation to counsel measured on an hourly basis, nor does it unfairly reduce the balance of the fund available for distribution to their clients. That multiplier leads to a fee award of $4,228,681.79 ($2,562,837.45 × 1.65), which the Court finds is fair and reasonable compensation for counsel for the services they have provided in this case.

d. *the percentage of recovery method for determining fees*

■ The Court notes that this fee of $4,228,681.79 is 24.5 percent of the settlement fund and that if we were to look at the issue of the reasonableness of the fee from the perspective of a percentage recovery of the fund, that percentage would be consistent with amounts as determined by courts in similar cases. *See In re Thortec Int'l Sec. Litig.,* Civ. No. 88–2470 (N.D.Cal. Aug. 15, 1989) (25 percent fee from recovery of $19.3 million); *In re Union Carbide Corp. Consumer Products Business Sec. Litig.,* 724 F.Supp. 160, 170 (S.D.N.Y.1989) (27 percent fee from recovery of $20.2 million); *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 748 (S.D.N.Y.1985) (25 percent fee from recovery of $18.6 million); *In re Pepsico Sec. Litig.,* Civ. No. 82–8403, 1985 WL 44682 (S.D.N.Y. Apr. 26, 1985) (20 percent fee from recovery of $21.5 million); *Philadelphia Elec. Co. v. Anaconda Am. Brass Co.,* 47 F.R.D. 557, 559 (E.D.Pa.1969) (25 percent fee from recovery of $22.175 million).

From 1973, the year of *Lindy I,* to 1985, courts in the Third Circuit consistently applied the lodestar method to determine attorneys' fees in common fund cases. *See, e.g., In re General Pub. Utils. Sec. Litig.,* [1983–1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,566, at 97,225, 1983 WL 22362 (D.N.J. 1983). In 1985, however, having recognized a number of difficulties in applying the *Lindy* formulation, the Chief Judge of the United States Court of Appeals for the Third Circuit, Ruggero J. Aldisert, formed a Task Force of judges and lawyers to study the subject of Court awarded attorneys' fees and to make recommendations on the criteria to be utilized in determining those awards. In its Report, the Task Force discussed the deficiencies of the lodestar method and concluded that in common fund cases, the percentage of recovery method is preferable. *Court Awarded Attorneys' Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237 (1985). Since that time, several district courts within the Third Circuit have looked to the percentage of recovery method as a basis for determining the reasonableness of attorneys' fees in common fund cases. *See, e.g., In re Smithkline Beckman Corp. Sec. Litig.,* 751 F.Supp. 525, 531 (E.D.Pa.1990); *In re First Fidelity Bancorporation Sec. Litig.,* 750 F.Supp. 160 (D.N.J.1990); and *In re GNC Shareholder Litig.,* 668 F.Supp. 450

(W.D.Pa.1987). Other district courts within the Third Circuit have concluded that the *Lindy* decisions preclude the use of the percentage of recovery method. *See, e.g., Waldner v. Shulman,* 1989 WL 100184 1989 U.S.Dist. LEXIS 10094 (E.D.Pa. Aug. 25, 1989). The United States Court of Appeals for the Third Circuit has not yet addressed whether *Lindy* precludes the use of the percentage of recovery method.

Michael P. Malakoff of Berger Kapetan Malakoff & Meyers, P.C. in Pittsburgh, Pennsylvania presented an excellent paper on these issues to the 1991 Third Circuit Judicial Conference, titled *Update on Third Circuit Fee Task Force Report on Court Awarded Attorneys' Fees,* September 13, 1991. In his paper he suggested that now is the time to revisit the area of setting fees in common fund cases, and set out the following arguments in support of the percentage method for establishing compensation:

> The percentage method is simple to administer. It is predictable and allows all parties to know what the attorneys' compensation will be. It provides a known incentive for the attorney's time rather than *ex post* consideration of prior decisions made about time spent. The percentage method is widely used in the legal marketplace in contingent fee agreements and better reflects what a client, at the outset of the litigation, is willing to pay. It removes any incentive for delay and removes any perceived penalty associated with early settlements. It economizes on valuable judicial time in dealing with fee applications. Under the percentage system, the costly monitoring of the attorney's service would no longer be required.

As noted above, the Court has found the *Lindy* method difficult to apply in this case, in part because it suggests that in exercising informed discretion, the Court should be resolving issues of fact in a context where the development of the factual record could (and perhaps should) be much more comprehensive. The difficulties run the spectrum from not having a sufficiently sophisticated data base of information to make a reliable judgment on market rates for billing professionals, to having to review and evaluate an enormous amount of information on the nature, quality and efficiency of work performed by a number of people over the course of years of litigation. Reaching truly reliable conclusions on factual issues at either end of that spectrum would take an enormous amount of time and energy. While this Court would prefer to build a record of a decision on the reasonableness of a fee on a solid and reliable foundation of facts, that may not be the best approach in a case such as this. It may be that the discretion provided the Court in looking to a percentage of recovery method would lead to just as reasonable a finding on a fee and one that more clearly recognizes the amount of judgment and discretion that goes into making that decision. In this case, if the Court were free to apply the percentage of recovery method, it would find a recovery in the range of 24.5 percent of the settlement amount is fair and reasonable in light of the size of the fund and the nature of the services provided.

### B. *Reimbursement of Expenses*

Plaintiffs' counsel request reimbursement of certain expenses incurred in prosecuting this action. Greenfield & Chimicles requests reimbursement in the amount of $804,335.15. Wolf Haldenstein Adler Freeman & Herz requests reimbursement in the amount of $297,052.39.

■ In considering this request, the Court looks to whether the expenses are reasonable, necessary to the prosecution of the litigation, and adequately documented. *See, e.g., In re Smithkline Beckman Corp. Sec. Litig.,* 751 F.Supp. at 533. In seeking a reimbursement of expenses in a case such as this, counsel should expect the Court will examine each item in the same way as would a careful client on being asked to reimburse counsel for an expense counsel incurred without having had an opportunity to obtain prior approval from that client.

#### 1. *Greenfield & Chimicles*

a. *$21,386.99 for travel, food, and lodging*

■ The Court will grant Greenfield & Chimicles' request to be reimbursed $21,-386.99 from the fund for travel, food and

lodging expenses incurred in connection with the litigation, as the firm has adequately documented these expenses and they appear to be reasonable. For example, the hotel accommodations appear to have been billed at moderate rates and the airline travel is in coach class.

These expenses also appear to have been necessary to the presentation of the plaintiffs' claims as they were incurred for document review and depositions of Hercules' personnel at the Hercules Aerospace Plant in Salt Lake City, depositions of Martin Marietta personnel in Denver, and depositions of Air Force Officers in Los Angeles.

b. *$52,338.16 for postage/express mail, telephone, facsimile, photocopying by the firm and messenger/courier*

■ The Court will deny the firm's request to be reimbursed the $52,338.16 paid for postage/express mail, telephone, facsimile, photocopying by the firm and messenger/courier. The firm has not provided the underlying documentation that identifies the individual expenses or services incurred. Nor has the firm identified the billing rates for each item.

c. *$13,417.22 for other office expenses*

The firm seeks to be reimbursed for the following out of pocket expenses: $6,011.14 for clerical overtime; $6,870.56 for LEXIS/computer research; $160.12 for publications; $336.19 for copies of SEC materials; and $39.21 for miscellaneous office expenses.

■ The Court will deny the firm's request for reimbursement for clerical overtime expenses, as the firm has made no showing that the clerical overtime was necessary. That is, it has not shown there was a particular problem or problems that required incurring these expenses, such as the late delivery of documents prior to a deposition or the preparation of papers for a court hearing that was scheduled on short notice. A review of the staff's time records shows that a substantial amount of the overtime work involved typing internal memoranda for counsel. Absent a showing of a particular need to have that and the other work done on an overtime basis, the Court will not order the

firm reimbursed from the fund for these amounts.

■ The Court will order the firm reimbursed from the fund for computer research expenses in the amount of $2,483.01, as the documentation submitted by the firm for computer research costs appears to show charges attributed to the Hercules matter in that amount, rather than the requested $6,870.56. The remainder of the office expenses sought by the firm appear to be adequately documented, reasonable and necessary to the preparation of the plaintiffs' case.

Accordingly, the Court will order the firm reimbursed for a total of $3,018.53 of the requested $13,417.22 for office expenses.

d. *$77,838.23 for other out of pocket expenses and for services and materials provided to the firm, including filing fees, photocopying, deposition transcripts, and subpoena services*

■ The firm has adequately documented $77,838.23 in expenses for other out of pocket expenses, and for services and materials provided to the firm, including filing fees, photocopying, deposition transcripts, and subpoena services. These expenses appear to be both reasonable and necessary to the presentation of the plaintiffs' claims. The Court will, therefore, order that they be reimbursed from the settlement fund.

e. *$228,840.45 for professional services*

■ The firm seeks reimbursement for professional services in the following amounts: $5,756.40 for the Law Offices of Jonathan Cuneo; $30,000 for Howard, Lawson & Co.; and $193,084.05 for Rubino & McGeehin.

The Court will deny the firm's request for reimbursement for the fees and expenses incurred by the Law Offices of Jonathan Cuneo. The firm has not established that these services were necessary to the presentation of the plaintiffs' claims. Moreover, the documentation provided by the Law Offices of Jonathan Cuneo provides an insufficient basis to evaluate the nature and value of the services provided.

The Court will also deny the firm's request for $30,000.00 to pay Howard, Lawson & Co. for professional services and expenses as these fees and costs have not been adequately documented. In support of the request, the firm has submitted a one page summary invoice which does not identify the hours spent, the billing rates, or the specific expenses incurred. Furthermore, the firm has not shown that this expense was necessary for the preparation or presentation of the plaintiffs' case.

The Court will grant the firm's request for reimbursement for professional services provided by Rubino & McGeehin. The firm has provided the Court with extensive documentation on the expenses and fees incurred by Rubino & McGeehin which includes monthly bills identifying the hourly billing rate, the billable time recorded, and the expenses incurred for each billing professional. Moreover, it appears Rubino & McGeehin's accounting expertise was necessary to the presentation of the plaintiffs' claims, as the most significant liability issue in the case involved the interpretation and application of accounting Statement of Position 81–1.

### f. $377,764.48 for expert witness fees

■ The Court will deny the firm's request for reimbursement of the $377,764.48 paid to PVR. In support of the request, the firm has provided a two page breakdown of PVR's fees showing the hours worked and the rates charged by each billing professional. This documentation is inadequate to provide the Court with a factual basis to evaluate the nature of the work done, the quantity and quality of the work, the reasonableness of the rates charged, the necessity for the work, and the nature of its contribution to the plaintiffs' case.

### g. $32,749.62 for notice costs and partial nominee reimbursement

The Court will grant the firm's request to be reimbursed $32,749.62 for expenses incurred for notice costs and partial nominee reimbursement, as they are adequately documented, appear to be reasonable, and were necessary for the resolution of the plaintiffs' case.

### h. summary

In summary, the Court will order Greenfield & Chimicles reimbursed from the settlement fund for $328,077.42 in out of pocket expenses.

### 2. Wolf Haldenstein Adler Freeman & Herz

### a. $39,411.35 for travel, food, and lodging

■ Wolf Haldenstein seeks $39,411.35 in reimbursement for expenses incurred for travel, food and lodging. The Court finds these expenses incurred by the firm were necessary to the presentation of the plaintiffs' claims and are adequately documented. However, the invoices reveal that there may not have been a uniform office policy at the firm on the nature and amount of expenses that are reasonable for the members of the firm to incur on behalf of their clients. For example, the firm is seeking reimbursement from the fund for the $437.57 Peter Harrar spent for a one night stay at the Four Seasons Hotel in Philadelphia on March 6, 1991. The bill includes food and beverage charges of $149.98, plus a private bar tab of $13.00. The charge for the room was $235.00 a night. See Appendix to Second Supplemental Affidavit of Daniel W. Krasner, volume II of II at Exhibit J. It does not appear that all of the members of the firm have adopted this life-style, as other bills submitted by the firm show, for example, that they have stayed at the Radisson Suites Hotel at 18th and the Parkway in Philadelphia for a rate of only $119.00 a night. The Court also notes that the August, 1993 issue of the American Bar Association Journal shows that members of the Association can obtain a preferred rate in Philadelphia at the Ritz–Carlton, $160.00 a night for a standard room, or $195.00 at the club level. The Court expects a client would prefer to reimburse the firm at those rates, rather than at the rates charged at the Four Seasons.

While it may be that Wolf Haldenstein is willing to incur the expense of a Four Seasons lifestyle, it is not appropriate for the firm to seek to impose it on its clients. Wolf Haldenstein should have attempted to parse out the expenses that are truly reasonable. Since it did not, the Court has reviewed the

billings and noted a number of other instances where expenses were incurred that a client could and would question, including billing for deluxe rooms, and a relatively liberal use of room service for meals. (*See e.g.* the $81.90 bill for room service for the March 7, 1991, stay at the Hotel duPont, followed by a breakfast in the Green Room at the Hotel for $57.25 at D.I. 225, Exhibit J). Based on a review of each of these bills, the Court estimates that unnecessarily high expenses have unreasonably inflated the total the firm seeks from the fund in reimbursement for travel, food and lodging. The Court will, therefore, discount the requested amount by 20 percent and order $31,529.08 reimbursed from the fund to the firm for these items.

b. *$23,911.75 for postage/express mail, telephone/facsimile, photocopying by the firm, and messenger/courier*

■ The firm requests reimbursement of the following office related expenses: $8.80 for postage; $3,609.98 for express mail; $3,028.22 for telephone and facsimile expenses; $17,165.25 for in-firm photocopying; and $99.50 for messenger/courier.

The Court will grant the firm's request for reimbursement for the expenses incurred for postage, express mail, and in-firm photocopying as they appear to be reasonable, necessary, and adequately documented.

Although the firm requests $3,028.22 for telephone and facsimile expenses, the Court has reviewed the bookkeeping records in support of this request and these records appear to show telephone and telecopy expenses in the amount of $514.44. Accordingly, the Court will allow reimbursement for telephone and telecopy expenses in that amount.

The Court will deny the firm's request for reimbursement of messenger/courier expenses as it has not identified the nature of these services or described why these expenses were reasonable and necessary for the presentation of the plaintiffs' claims.

Based on the foregoing decisions, the Court will allow reimbursement for these office related expenses in the amount of $21,298.47.

c. *$13,545.31 for other office expenses*

The firm seeks reimbursement for the following additional office related expenses: $9,778.18 for staff overtime; $3,455.18 for on-line computer costs; and $311.95 for other research services.

The Court will deny the firm's request for reimbursement for overtime pay for secretaries, overtime meals for secretaries and professionals, and taxicab or car services for secretaries and professionals, as the firm has not identified any particular time demands which required overtime work by clerical or professional staff.

■ The firm has requested $3,455.18 for on-line computer costs which includes a 150 percent mark-up to cover overhead charges. The Court will award reimbursement for on-line computer expenses without the overhead charges, which results in a reimbursement of $2303.45.

The firm has requested $311.95 in reimbursement expenses incurred in obtaining Hercules' common stock transaction reports and full text copies of Hercules' SEC filings. As the two invoices submitted by the firm total $267.27, the Court will award expenses in that amount.

Based on the foregoing decisions, the Court will allow reimbursement of these additional office expenses in the amount of $2,570.72.

d. *46,349.72 for out of pocket expenses and for services and materials provided to the firm, including court fees, photocopying, deposition transcripts, process servers, and witness fees*

The firm seeks reimbursement for the following out of pocket expenses; $137.25 for court costs; $23,260.09 for photocopying provided to the firm; $22,142.38 for deposition transcripts; $610.00 for process server costs; and $200.00 for witness fees.

Other than the photocopying expenses, these expenses appear to be adequately documented, reasonable, and necessary to the successful prosecution of the plaintiffs' claims. Accordingly, the Court will grant the firm's request for reimbursement of these out of pocket expenses.

The firm reports that of the $23,260.09 requested by the firm for photocopying expenses, $17,860.17 was paid to Greenfield & Chimicles as reimbursement for their copying expenses for various document productions. The documents submitted by the firm, however, show only one bill from Greenfield & Chimicles in the amount of $15,813.30, of which $11,749.53 is for photocopying expenses.

Although the court believes that Wolf Haldenstein reimbursed Greenfield & Chimicles for its photocopying expenses, the Court will deny the firm's request to be reimbursed the $23,260.09 for photocopying. This denial is based on the same lack of documentation and failure to identify billing rates that led the Court to deny Greenfield & Chimicles' request for in house photocopying expenses.

Based on the foregoing decisions, the Court will order the firm reimbursed $23,089.63 from the fund for these out of pocket expenses.

e. *$171,158.72 for professional services*

For the reasons discussed above in the section on Greenfield & Chimicles' expenses, the Court will grant the firm's request to be reimbursed $171,158.72 for accounting advice and services provided by Rubino & McGeehin.

f. *$4,123.34 for notice costs*

The Court will order the firm reimbursed $4,123.34 from the fund for expenses relating to notice to potential class members, as these expenses are adequately documented, reasonable, and were necessary to the presentation of the plaintiffs' claims.

g. *summary*

In summary, the Court will order that $253,769.96 be paid from the fund to Wolf Haldenstein as reimbursement for their reasonable and necessary expenses.

C. *Interest on Payments From the Fund*

■ As the defendants have paid the $17,250,000 settlement amount into an escrow account, this money has been earning interest while the Court has been considering these applications. The Court will, therefore, include in its order a provision that the amounts awarded to counsel and the payments reimbursing them for out of pocket expenses include a proportionate share of the interest actually earned by the funds in the account.