Andrew B. SPARK, on behalf of himself and all others similarly situated, Plaintiff,

v.

MBNA CORPORATION, MBNA America Bank, N.A., MBNA Marketing Systems, Inc., Richard K. Struthers, Terrance R. Flynn, David L. McGowan, and Mark C. Sullivan, Defendants.

No. CIV. A. 96–497RRM.

United States District Court, D. Delaware.

Aug. 1, 2001.

William L. O'Day, Jr., Tomar, O'Brien, Kaplan, Jacoby & Graziano, Wilmington, Delaware; Daniel A Edelman, Cathleen M. Combs, James O. Latturner and Keith J. Keogh, Edelman, Combs & Latturner, LLC, Chicago, Illinois; counsel for plaintiff.

Kathleen M. Jennings–Hostetter, Oberly, & Jennings, Wilmington, Delaware; Richard J. Urowsky, Richard C. Pepperman, II and Sharon L. Nelles, Sullivan & Cromwell, New York City; counsel for defendants.

## OPINION

McKELVIE, District Judge.

This is a fraud and misrepresentation case. On May 3, 1996, Andrew B. Spark filed a complaint against MBNA America Bank and certain of its officers and affiliated corporations seeking damages for himself and a class of MBNA credit card holders for an alleged deceptive practice in the bank's offering of a promotional rate of interest for new customers. On June 30, 1997, the court denied the defendants' motion for a summary judgment, and on February 20, 1998, granted plaintiff's motion for class certification, defining the class as persons sent advertising by MBNA Corporation promoting a special low introductory annual percentage rate on cash advances or balance transfers of 6.9% to 9.9%, who opened a credit card account with MBNA and used the card for purchases as well as cash advances or balance transfers, and defined the class period from May 3, 1991 to May 3, 1996. A copy

of the February, 1998 decision is reported as *Spark v. MBNA Corp.*, 178 F.R.D. 431 (D.Del.1998).

On September 22, 2000, the parties filed a motion for approval of a class settlement agreement. In the motion, the parties report they have agreed on a settlement of $3.57 for each of 1.8 million class members. Under the agreement, MBNA will automatically credit $3.57 to the accounts of certain members of the class and pay $3.57 to others who notify it they wish to receive the payment. In addition, MBNA will pay $10,000 to Spark and $1,285,200 in fees and costs to plaintiff's counsel.

The parties mailed notice of the proposed settlement to the class and invited members to comment, object, elect not to participate and, where appropriate, opt to receive the payment. They presented their motion for an order approving the settlement to the court on May 24, 2001. This is the court's decision on the motion.

## I. FACTUAL AND PROCEDURAL HISTORY

The court draws the following facts from the affidavits and papers submitted by the parties in connection with the motion, the court's prior opinions in this matter, and the record of the proceedings in this case.

### A. Nature of the Action

Andrew Spark is a resident of Sarasota, Florida. In a complaint filed on May 3, 1996 in the United States District Court for the Middle District of Florida, Spark sued MBNA America Bank, N.A., its subsidiary MBNA Marketing Systems, Inc., its parent, MBNA Corporation, and Richard K. Struthers, Terrance R. Flynn, David L. McGowan and Mark C. Sullivan, officers of the Bank, alleging the defendants had fraudulently and deceptively marketed a promotional rate of interest for the Bank's credit card. Spark alleged the

marketing breached contractual duties of good faith and fair dealing to the credit card customers, was an unfair and deceptive trade practice in violation of Delaware's Deceptive Trade Practices Act, 6 Del. C. § 2512, and was a criminal enterprise violating federal mail and wire fraud statutes. Spark sought an order certifying the matter as a class action, compensatory damages, treble damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961–1968, punitive damages under the Deceptive Trade Practices Act, attorneys fees and costs.

Defendants answered by denying liability and asserting certain affirmative defenses. They also moved for a change of venue to have this matter transferred to the District of Delaware. Plaintiff moved for an order certifying the matter as a class action. By an order dated October 10, 1996 the court in Florida transferred the case to this court. On November 6, 1996, MBNA moved for a summary judgment and to stay plaintiff's motion for class certification. Plaintiff responded with a motion for an extension of time to respond, arguing plaintiff would need to take discovery before responding to the motion. During a February 3 status conference, plaintiff's counsel reported that plaintiff expected to file an amended complaint. The court deferred a decision on plaintiff's request for discovery and established a briefing schedule on the motion for summary judgment and oral argument on the motion on April 8, 1997.

On March 31, plaintiff filed a motion to amend his complaint. On April 8, counsel presented arguments on defendants' motion for summary judgment.

Spark's claim is based on a promotional offer he received in the mail from MBNA American Bank in May of 1995. MBNA invited him to open a Visa account with a

six-month promotional annual percentage rate of 6.9% on cash advances, including on cash advances to pay off balances due on credit cards with a higher rate of interest. Spark opened the account pursuant to a credit card agreement and transferred a balance to the account. The credit card agreement provided that MBNA would charge an indexed periodic interest rate then at 17.9% and would allocate any payments he made on the account, including payments on cash advances and on retail purchases, in a manner it determined. In July, MBNA sent Spark a letter offering to extend the 6.9% APR for another three months, through February 1996. The letter included a chart showing the amount of savings that one would receive with this low APR, compared to the amounts paid on "higher-interest credit card or department store bills." The table appeared as follows:

| Transfer Amount | $1,500 | $3,000 | $1,500 | $3,000 |
|---|---|---|---|---|
| Annual Percentage Rate | 21.0% | 21.0% | 13.9% | 19.9% |
| Six Months' Interest | $157.50 | $315.00 | $149.25 | $298.50 |
| Six Months' Interest at 6.9% APR | $51.75 | $103.50 | $51.75 | $103.50 |
| Savings | $105.75 | $211.50 | $97.50 | $195.00 |

Spark drew cash advances from the account and made certain retail purchases with the card. MBNA's monthly statement to him showed the balance due for cash advances and the corresponding 6.9% APR, and the balance due for the purchases and the corresponding 17.9% APR. On receiving a payment from Spark on the account, MBNA applied that payment to pay amounts due in the following order: 1) non-interest bearing fees and finance charges; 2) interest bearing fees and finance charges; 3) billed but unpaid cash advance balances; 4) billed but unpaid purchase balances; 5) new cash advance balances; and 6) new purchase balances. (MBNA changed this formula on April 20, 1996).

In his complaint, Spark alleged that MBNA's practice of crediting all payments to the cash advances until they were paid off effectively denied him the benefit of the lower rate and that consequently MBNA's advertisements offering the lower rate were false, deceptive and misleading. He noted, for example, that in the table set out above, the only way a customer with a transfer balance of $1,500 could realize the estimated annual savings of $105.75 would be if he or she did not make any retail purchases.

In support of their motion for a summary judgment, defendants argued that the calculations in the table were merely an illustration and that no person of ordinary prudence and comprehension would construe the savings chart as an implicit representation that payments would be allocated in a certain manner or as a promise of specific savings. In making this argument, defendants noted that plaintiff could not have relied on the information in the savings chart in making his decision to open the account, as MBNA did not mail the letter to him until September, when it mailed the letter to existing card holders and offered to extend the promotional rate. In addition, defendants argued it would be difficult to believe the plaintiff had in fact been mislead, as he is a lawyer, practices in the field of commercial and consumer credit law, and has between 30 and 40 different credit cards accounts. Defendants also argued that the court should grant their motion, as even if the plaintiff was correct and the information in the table was misleading, the damages plaintiff or any member of the class would have suffered would be de minimus and any

misstatement would not, therefore, have been material to the transaction.

By an order dated June 30, 1997, the court granted plaintiff's motion to amend and denied defendants' motion for a summary judgment.

## B. *Class Certification*

Plaintiff renewed his motion for class certification and proposed that the class consist of all persons to whom MBNA sent advertising on a promotional rate and who then opened an MBNA account and used the card for purchases as well as cash advances. Defendants opposed the motion arguing that plaintiff could not show that common questions of law or fact predominate, that his claims are typical or that he would be an adequate representative. By a decision and order dated February 20, 1998, the court granted Spark's motion and defined the class as follows:

All persons who:

a. were sent advertising by MBNA Corporation promoting a special low introductory (6.9%—9.9%) annual percentage rate on cash advances and/or balance transfers;

b. opened a credit card account with MBNA; and

c. used the card for purchases as well as cash advances or balance transfers.

The court defined the class period as follows:

a. The four years preceding the filing of the complaint, May 3, 1992 through May 3, 1996, for Counts I and II, the claims brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961–1968.

b. The five years preceding the filing of the complaint, May 3, 1991 through May 3, 1996, for Count III, the breach of contract claim.

c. The three years preceding the filing of the complaint, May 3, 1993 through May 3, 1996, for Count IV, the claim brought under Delaware unfair deceptive practices law, 6 Del. C. § 2513.

Defendants thereafter renewed their motion for a summary judgment, moved to decertify the class, and for an order allowing an interlocutory appeal. By an order dated August 7, 1998 the court denied the motions.

## C. *The Settlement Agreement*

On September 22, 2000, counsel for the parties filed a joint motion for preliminary approval of a class settlement agreement. In the agreement, MBNA reported that there are approximately 1.8 million members of the class and that approximately 80% of the class had current accounts with MBNA. And, 80% of those with current accounts (64% of the class) have accounts that are active. Under the agreement, plaintiffs would settle their claims against the defendants in exchange for the following payments. MBNA would credit $3.57 to the account of each class member who has an active account with MBNA. As to members of the class who no longer have an account with MBNA or who have an account but it is not active, MBNA would pay $3.57 to each class member who submits a claim. Class members would be mailed a notice of the settlement and those who would need to elect to get the payment could do so by mail or by calling a toll fee telephone number set up by MBNA. The parties agreed class counsel would petition the court for an award of fees and costs to be paid by MBNA in the amount of $1,285,200, which the parties identified as 20% of the potential credits and payments to the class. In addition, MBNA would pay Spark $10,000 for his services as class representative.

By an order dated September 25, 2000, the court found the proposed settlement

was in the range of a fair and reasonable settlement, directed notice be sent to members of the class describing their right to opt out of the class and scheduled a hearing on the fairness and reasonableness of the agreement.

Notice was mailed to the class. Members of the class mailed letters with comments and objections directly the court.

### D. *Hearing on the Motion to Approve the Settlement*

The parties presented the motion on May 24, 2001, at which time certain members of the class appeared and objected to certain terms of the agreement. Prior to the hearing, the parties reported that there were 1,838,757 members of the class. Of that total, 478 had elected to opt out and 35 had objected, but not opted out. For the total settling members of the class, 754,960 are current and active account holders and MBNA would credit $3.57 to their accounts. A total of 93,859 members of the class who do not have an account or have an account that is not current elected to accept the settlement and MBNA would pay each $3.57. Consequently, MBNA would pay a total of $3,030,283.83 to the class out of an estimated potential liability under the agreement of $6,426,000.00.

At the hearing, counsel for plaintiff and defendants reported that they had agreed to modify the settlement to provide that, in addition to the payments set out above, MBNA will credit $3.57 to the accounts of 421,844 member of the class who are current and not active account holders. (Counsel reported that MBNA would identify those 421,844 class members by selecting current and not active accounts as of November, 2000 and each month before that until they had reached a total of 421,-844.) In describing this agreement, counsel reported that in entering into the initial

agreement counsel had estimated that approximately 64% of the class would be current active cardholders who would receive the automatic credit. However, when they sought to implement the agreement by looking at active cardholders during the months of November and December of 2000 and January of 2001, only 41% of the class were current active cardholders. By adding an additional 421,844 class members to the group to receive automatic credits, MBNA would provide an automatic credit to approximately 69% of the class, a number more in line with what the parties had sought to achieve when they structured the settlement. With this change, MBNA increased its payout under the settlement by $1,505,983.08, to a total of $4,536,266.91.

### E. *Objections to the Settlement*

Prior to and at the hearing class members commented on and objected to a number of the terms of the proposed settlement and counsel for Spark and the defendants offered information and argument in support of the settlement. The issues identified by the parties include the following.

#### 1. *The adequacy of the $3.57 to paid to the class members*

In corresponding to the court, a number class members wrote thoughtful letters objecting to the settlement, reporting that the litigation and settlement was frivolous, silly and evidence of what is wrong with our system for civil justice. Others objected to the settlement as inadequate and attached copies of their monthly statements and their calculations showing they estimated their damages as much more than $3.57.

In supporting the settlement and responding to these objections, counsel reported that each side had retained an ex-

pert to calculate estimated damages for the class. Defendants report their expert estimated the average damage for a class member at $7.13. Plaintiff's expert apparently came up with a range of damages, the low end of which was at $7.01. Counsel report that $3.57 was a compromise amount, reflecting uncertainties each side faced in the litigation.

In support of this number, counsel noted one test of the fairness of this amount would be to look at the actual damages suffered by two objectors represented at the hearing. One objector had opened his account one month before the class period and a review of documents relating to his account showed he had suffered no damages. A review of documents relating to a second objector's account showed that his damages were 41 cents.

### 2. *The requirement that certain members of the class elect in to be paid*

Certain members of the class objected to the terms of the settlement that required members of the class elect to be paid. In papers submitted before and at the hearing, plaintiff's counsel reported that in agreeing on the structure for the settlement counsel had considered a number of factors, including the estimated damages, the compromise amount of $3.57, the number of individuals in the class, the total amount to be paid by MBNA, how the payments might be made, the costs to MBNA of mailing checks, and whether there would be a reversion of unclaimed funds to MBNA. He reported that the agreement reflected a compromise that took these factors into consideration and struck a balance that reduced the cost to MBNA by providing for a credit to current card members, and minimized the imposition on class members who would elect to receive the settlement by allowing them to do it by telephone.

### 3. *The distinction between class members who receive a credit and those who must elect to receive a payment*

Certain class members objected to the modification in the settlement, arguing that the automatic benefits should have been extended to every member of the class with a current, non-active account, as it would be inappropriate to structure the settlement to reach a dollar amount rather than the maximum number of members of the class.

### 4. *The appropriateness of the $10,000 payment to Spark*

A number of class members objected to proposed $10,000 payment to Sparks. Counsel for plaintiff defended the payment as fair compensation to Mr. Sparks for the initiative, time and effort he invested in the case, including having identified the claim, having located and retained counsel, and having pursued the case, which among other things meant that he had to appear and be deposed. Counsel noted that the award to Sparks would be in addition to the amount to be paid to the other members of the class.

### 5. *The $1,285,200 to be paid to class counsel*

Most of the comments and objections to the settlement were addressed to the proposed $1,285,200 payment to counsel. Plaintiff's counsel defended the fee, arguing that a fee set as a percentage of the recovery for the class is appropriate and that he selected a reasonable percentage, twenty percent of the total recovery, during negotiations and maintained that position throughout the settlement negotiations.

Most of the objections were directed to the difference between what each plaintiff would receive and what counsel would receive under the settlement. (One class member opted out, writing: "This appears to be nothing more than a scheme to enrich the attorney 'representing' the class (I would contend that the attorney is representing its own financial interest). If the actual damages really amount to $3.57 per person, it is unconscionable that the attorney would reap a windfall of $1,285,200! I do not want my name associated in any way with this type of legal golddigging.")

A number of class members objected to Edelman, Combs & Latturner's request for a fee as too high, and way out of proportion to the benefit received by each member of the class. They described the firm's application as ridiculous. ("It is otherwise apparent from the proposal that the attorneys' fees in this matter to be paid of $1,285,200.00 are clearly the primary purpose behind this litigation . . . .")

At the close of the hearing, the court reserved decision on the motion and asked plaintiff's counsel to file a supplemental paper that set out information on the work done by counsel, and their billable hours, billing rates and out of pocket expenses.

On June 4, plaintiff's counsel filed a paper setting out information on the work done by Edelman, Combs & Latturner, lead counsel. The paper sets out certain background information on the firm and its partners and as to the partners it reports that Cathleen Combs, Daniel Edelman and James Latturner bill at $350 an hour, and that Tara Goodwin bills at $300 an hour. It shows individual billing entries by the tenth of an hour for each partner who worked on the matter from January, 1996 to the hearing on the settlement, and shows the partners worked approximately 320 hours. It identifies work done by certain associates at rates from $135 an hour to $200 an hour. The total hours worked by the associates was in the range of 207 hours. And it identifies approximately 210 hours of work done by law clerks and legal assistants at rates ranging from $70 to $100 an hour. The total hours reported for partners, associates, law clerks and legal assistance at the firm was 735.8. At their reported billing rates, this time would have been billed at $169,402.50. The firm also filed a summary showing out of pocket expenses of $30,930.15.

On June 7, John Pentz, counsel for two objectors, filed a motion to supplement the record attaching and seeking to include in the record a paper Mr. Latturner apparently prepared and served in May, but did not file with the court. In the paper, Mr. Latturner reports that under the initial settlement agreement MBNA had estimated 64% of the class would receive a credit and that since then MBNA reported that number would be substantially less. In the paper, Mr. Latturner argued the court should increase the amount to be paid to paid to each class member to $5.34. At the same time he filed the motion to supplement, Mr. Pentz filed a paper objecting to plaintiff's fee application noting that the firm had sought a fee that was 7.4 times what it would receive at its reported billing rates and that the Court of Appeals for the Third Circuit in *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir.2001) had prohibited a fee payment in this type of case that was more than 3 times counsel's normal fees based on hours and rate.

On June 18, plaintiff's local counsel William O'Day filed a paper reporting that he had expended approximately 104 hours in this matter, that his billing rate is $185.00 an hour, and that he incurred out of pocket expenses were $196.69.

Mr. Latturner responded to Mr. Pentz's paper with a paper arguing that the Court of Appeals's decision in *Cendant* would not

preclude the award sought of $1,285,200, and that in any event Mr Pentz's calculations were incorrect. Mr. Latturner wrote:

Here, the total hours worked by the Edelman firm and O'Day is 834.7. The hourly rate for the senior Edelman partners is $350. Thus, the lodestar is $292,145. The total requested fees and expenses is $1,285,200. After the expenses of $31,888.86 are deducted, counsel is seeking $1,253,111.14 in fees. The multiplier to reach that amount from the lodestar is 4.3.

(For those of you who are skimming this opinion, I suggest you stop and reread that paragraph.)

## II. *DISCUSSION*

Plaintiff's motion presents two issues for the court to resolve. First, is the settlement fair, reasonable and adequate? Second, if it is, what would be a reasonable fee for plaintiff's counsel? The Court of Appeals has identified a number of factors a trial court should consider in resolving each of these issues.

### A. *Is the Settlement Fair, Reasonable and Adequate?*

 A starting point for our analysis is the general principle that our courts favor settlements of litigation, including settlements of actions where a plaintiff is pursuing claims as a representative of a class. The Third Circuit Court of Appeals has adopted a nine-factor test to help district courts structure their review of settlements to determine whether they are fair, reasonable, and adequate as required by Federal Rule of Civil Procedure 23(e). *See Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975). The factors are: (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the

risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range or reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation. Here is a review of these factors and certain other previously identified issues.

1. *Is the settlement fair and reasonable in light of the complexity and duration of the litigation, and the risks attendant to the litigation including the risks of establishing liability?*

While this litigation has been pending five years, the issues raised in the pleadings are not particularly complex or difficult. From the papers submitted by the parties in connection with the motions for a summary judgment, it does not appear there are many facts in dispute or that the claims for relief or defenses are difficult or complex.

While plaintiff survived defendants' initial waves of motions, and the court's decisions denying defendants' motion for summary judgment and certifying the class may have strengthened plaintiff's hand in settlement discussions, the decisions could not have been taken as an indication that the plaintiffs were more likely than not to prevail on the merits. The papers filed with the court in connection with those motions suggested plaintiff faced substantial risks that he might not be able to establish the defendants breached any duties in the transactions. From the court's perspective more information on what it is the defendants had done and why they did it would have allowed a better insight into the relative risks the parties faced in taking the case to trial.

One way of looking at what happened here is that any misstatement or inadequate or inaccurate statements the defendants made in connection with their promotional rate was inadvertent and a result of a lack of precision in thinking through what it is the customers were being told and could reasonably expect. On the other hand, it might have been (and discovery might have disclosed) that the defendants were aware of a risk that customers may not appreciate the incremental costs (and profits) in MBNAs procedures for allocating payments. Information confirming that MBNA implemented its procedures for allocating payments to take advantage of this incremental benefit would have converted this matter to a relatively strong case for the plaintiffs. Information that tended to refute that would substantially undermine plaintiff's probability of success.

On this record, and without that additional information, the risks as to liability appear to have been relatively evenly balanced, which suggests a settlement was appropriate, with the plaintiff's motivation to settle being to eliminate the risk of losing on the merits, and with the defendants' motivation to settle being based on the same factor as well as to avoid the time, distraction and publicity of further proceedings.

These facts suggest it is appropriate for the plaintiff to settle the claims.

2. *Is the settlement reasonable and adequate in light of the ability of the defendants to withstand a greater judgment, the risks of establishing damages, and the potential recoveries?*

There is no reason to believe that the defendants could not withstand a judgment for more than the total to be paid under the settlement. The court will, therefore, assume this factor is not relevant to an evaluation of the agreement.

From the information provided by the parties in connection with the motion to approve the settlement agreement, it appears that each side recognized problems with their damage case. From the plaintiff's perspective, the typical or average loss suffered by each class member was almost nominal. No doubt plaintiff's counsel appreciated that these low numbers would tend to undermine their case on liability, as a typical juror might look to the estimated loss for each class member as suggesting the damage from the alleged breach of duties was almost insignificant and, therefore, more likely the result of an inadvertent error rather than a more sinister scheme. For defense counsel, the significant number was 1.8 million, both because the number acted as quite a multiplier for an incremental increase in damages and as the administrative costs for settling a claim with a class of 1.8 million would be substantial.

From the information submitted by the parties, it appears plaintiff has agreed on a reasonable number for the dollar damages for each class member. While a number of class members have objected to the payment as too low, the court has no information to suggest the figure should be substantially higher. Each side has reported that its expert came up with a figure in the range of $7.00. In light of the risks the plaintiffs faced in establishing liability, a compromise at half that amount seems fair and reasonable.

It is correct that just prior to the presentation of the motion, plaintiff's counsel apparently sought to increase the payment to each member to $5.34. But that does not appear to have been a position counsel took because the $3.57 was inadequate. Rather, it appears counsel was more concerned about the total amount MBNA

would pay under the settlement, and was more tied to the structure the parties had agreed on in terms of who would get a credit and who would have to elect to receive a check.

The information the parties have submitted demonstrates that the settlement figure is derived from the low end of the range of damage figures as calculated by the experts and is the product of an agreed upon discount of approximately 50% that reflects a compromise that takes into consideration those factors parties typically look to in reaching a settlement agreement, including probability of success and the time, expense and distraction of litigation. The court finds the process the parties followed in reaching this figure was principled and appears to have resulted in a fair and reasonable settlement amount.

3. *Are the fee to Sparks, the opt-in requirements, and MBNA's reversionary interests fair and reasonable?*

Class members have objected to three aspects of the settlement, the fee to Sparks, the provision that require certain members to opt in, and MBNA's reversionary interest in any amounts not claimed by the class.

■ Certain class members have objected to the fee to Sparks as inappropriate in that he is being treated differently than other members of the class and that the amount he is to be paid is not reasonably related to the damages he suffered or the time and expenses he incurred in pursuing this matter. As an initial matter, the court finds there is no reason why Sparks can not be treated differently than other members of the class. In addition, there are reasons to treat him differently, including that he identified the claim and has invested time and energy in pursuing it on behalf of the other members of the class.

This suggests it would be fair to provide some additional compensation for Sparks. While it might be appropriate to agree on a formula or mechanism for calculating reasonable compensation for Spark, such as a formula tied to his time and expenses, no one has suggested such a formula and the court is not familiar with one. The figure agreed on by the parties appears to be reasonable, and is not excessive. One incidental benefit of including this payment in the agreement and putting it before the court is that it allows the court to recognize Mr. Spark's positive contribution and discourages other arrangements that may be inconsistent with how we resolve these matters.

Certain class members have objected that the settlement agreement should not be structured to require that individuals elect to receive a payment or to provide that MBNA will retain the balance of any amounts that would otherwise be paid to class members.

■ The court understands that in reaching an agreement on what the settlement would be and how it would be implemented, counsel and the parties had to make a number of practical decisions, including how to economically and efficiently distribute $3.57 to a class of 1.8 million people. The procedure the parties fixed on, a credit for current and active account holders and sending a check to others who call in to a toll free number, reflects a fair and reasonable balancing of a number of competing factors. Further, the agreement to provide a credit to an additional 421,844 class members reflects a reasonable compromise of the disagreement that arose after it became clear that the number of people who would receive the automatic credit was lower than MBNA had initially reported to plaintiff. The modification of the agreement appears to be consistent with the spirit of the parties'

initial settlement agreement and should prevent MBNA from benefitting from this error.

■ The court finds the provision for a reversion to MBNA is fair and reasonable, both in light of the opportunities the parties have given class members to elect to receive a check and in light of the practical problems MBNA would otherwise have in seeing that a check for $3.57 is sent to each class member.

### 4. Conclusion: the settlement is fair, reasonable and adequate.

■ In conclusion, and after considering the terms of the agreement, the *Girsh* factors, and the objections of certain class members, the court finds the settlement is fair and reasonable and will enter an order approving it.

### B. What are Fair and Reasonable Fees for Plaintiff's Counsel?

The Court of Appeals has found that there are two primary methods for determining a reasonable fee for counsel. One is the lodestar method, where the court awards a fee determined by multiplying billable hours reasonably expended, times a reasonable hourly rate, times a multiplier that reflects a number of factors, including the risks taken on by counsel and the results they have achieved. The second method for determining fees is the percentage-of-recovery, where the court awards a fee that is calculated based on a percentage of the funds recovered, with the court determining a reasonable percentage based on a number of factors, including the size of the fund, the nature and quality of counsel's work, and the results achieved.

In this case, the parties have structured the settlement so that it is not a traditional common fund case, as the fees will not be paid from a fund and any unclaimed funds from the settlement will be returned to MBNA. Nevertheless, the parties have proposed a fee based on a percentage of the total potential recovery for the class. Counsel estimate the recovery as $4,536,266.91, and propose the court award plaintiff's counsel approximately 28% of that amount, $1,285,200. This approach is similar to the one agreed to by the parties in *In re Cendant Corporation PRIDES Litig.*, 243 F.3d 722 (3d Cir.2001), where the Court of Appeals found that the settlement was sufficiently similar to a common fund case that it would be appropriate to determine a reasonable fee under the percentage-of-recovery method.

■ As the Court of Appeals noted in *Cendant* and in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir.2000), the factors a court should consider in awarding fees using the percentage-of-recovery method in common fund class actions include the following: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. The Court has also suggested the trial court cross check any percentage award against the lodestar award method. *See Gunter*, 223 F.3d at 195 n. 1. Here is a review of these and other factors.

### 1. The size of the fund, the number of persons benefitted and awards in similar cases

Under the settlement, MBNA will pay up to $4,536,266.91 to 1,270,663 class members. This is a relatively small fund for a

relatively large class. As the Court of Appeals noted in *Cendant*, courts tend to follow a sliding scale in awarding fees from a fund, with the percentage of the fund paid out in fees declining as the size of the fund increases. Consequently, where a court might award a fee of 5 to 6% for a recovery of over $100,000,000, it might award a fee in the range of 20 to 30% for a recovery in the $5, 000,000 to $25,000,000 range. *See generally Steiner v. Hercules Inc.*, 835 F.Supp. 771, 791 (D.Del.1993) (identifying relevant cases). If we add the amount MBNA will pay the class to the amount it has agreed to pay counsel, we see the total MBNA is paying out could be up to $5,821,000, and the fees and costs of $1,285,000 would be 22% of this amount.

These facts suggest the fee being sought by plaintiff's counsel, when measured as a percent of the total MBNA is paying out, is in the range of what courts typically find fair and reasonable.

### 2. *Risk of nonpayment*

Risk of nonpayment is not a relevant as a factor in this case, as there is no basis for believing there was a risk plaintiff's counsel could not recover on any judgment.

### 3. *Class members' objections*

Members of the class have set out substantial objections to the fees requested. The court will address these objections as it reviews the other factors.

### 4. *The complexity of the litigation*

As previously noted, the matters in issue in this case are not particularly difficult or complex. Plaintiff has identified a relatively limited number of facts he will rely on to establish liability and he contends the defendants have breached fairly well defined duties. Certain damage issues are complicated, in the sense they may be difficult to quantify, but they do not appear to be particularly complex.

### 5. *The duration of the litigation and the amount of time plaintiff's counsel devoted to the case*

The court has prepared the following table with information from the Summary of Time and Expenses filed on June 4, 2001 by plaintiff's lead counsel, Edelman, Combs & Latturner on June 4, 2001. The table sets out by year a general description of the work done and the billable hours recorded by partners, by associates, and by law clerks and legal assistants.

| Year | Nature of Work | Total Hours Recorded by Partners | Total Hours Recorded by Associates | Total Hours Recorded by Clerks |
|------|----------------|-----------------------------------|-------------------------------------|---------------------------------|
| 1996 | Prepare Complaint, Respond to Motion to Transfer | 18.2 | 51.6 | 87.5 |
| 1997 | Review Documents, Respond to Defendants' Motion for Summary Judgment, Plaintiff's Deposition, Prepare and Present Motion for Class Certification | 41.2 | 101.5 | 19.2 |
| 1998 | Respond to Renewed Motion for Summary Judgment, Review Documents and Damage Information with Expert, Settlement Discussions | 23.7 | 49.8 | 5.2 |

| Year | Description | | | |
|---|---|---|---|---|
| 1999 | Settlement Discussions | 19.7 | .5 | 23.2 |
| 2000 | Court Sponsored Mediation Conferences, Review Damage Information with Expert, Negotiation of Settlement and Agreement | 133.1 | 2.9 | 13.8 |
| 2001 | Memorandum in Support of Agreement | 84.7 | 1.0 | 59.0 |
| | Total Hours | 320.6 | 207.3 | 207.9 |
| | Loadstar (billable hours, times hourly rate) | $111,245.00 | $40,646.00 | $17,511.50 |

Among other things, this summary shows that while the case has been pending for five years, for large blocks of time during those years counsel did relatively little work on the case. For example, the lawyers at Edelman, Combs & Latturner spent less than 21 hours working on the case in 1999. Second, this summary suggests that counsel did not invest substantial time in pursuing discovery and preparing the case for trial. For example, it does not appear that plaintiffs took any depositions during the five years the case was pending. Third, this summary suggests counsel allocated responsibilities so that the associates did a substantial amount of the work in the early stages of the litigation, and the partners took on a greater role during settlement discussions and in preparing and presenting the settlement agreement. Of the work done by the partners, 218 hours or approximately 70% of their time was entered after January 1, 2000, when the work was exclusively directed to negotiation and agreement on a settlement.

### 6. *The skill and efficiency of the attorneys involved*

■ Plaintiff's counsel have not demonstrated unique skill and unusual efficiency that would suggest it is appropriate to look beyond their normal billing rates and billable hours to find a fair value for the services they provided in this case. On the contrary, certain of the papers they have submitted suggest that they have not diligently applied their talents to this case. For example, in the paper they submitted in support of their fee application, Plaintiff's Memorandum in Support of Final Approval of Class Action Settlement Agreement, they failed to cite the relevant Third Circuit case law on either the settlement of class actions or on the evaluation and approval of counsel fees. Actually, they failed to cite any Third Circuit cases or the standards and factors the Court of Appeals has directed this court look to in resolving the application. After they submitted their million dollar application, the court had to suggest to them that they would need to file a summary of information on the firm that is required in this circuit, its billing rates, the work done and billable hours. When a class member objected to the application as seeking a multiplier of 7.4 times its loadstar and cited *Cendant* for the proposition that the Court of Appeals has set a ceiling of 3 in this Circuit of a fee multiplier, counsel responded that the multiplier it was requesting was not 7.4, but 4.3. Counsel calculated that 4.3 by adding the total hours worked for lead and local counsel, the partners, associates, law clerks, and legal assistants and multiplying the total by the hourly rate for the senior Edelman, Combs

& Latturner partners, $350. As the Court of Appeals has noted, a court determines counsel's lodestar award by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer. *See Gunter*, 223 F.3d at 195 n. 1. This means that in calculating counsel's lodestar it is not appropriate to multiply a law clerk or paralegal's billable hours by the senior partner's billing rate. The objector was correct: the multiplier sought by plaintiff's counsel is in the range of 7.4 and not 4.3.

### 7. *Nature of the case*

While a number of class members have objected to the settlement as inadequate in that the recovery of $3.57 to each class member is too small, a larger number of class members objected to the theory of the case (that they were misled) and the amount of the fee sought, especially when that number is compared to the almost nominal recovery for the class members. There are at least two issues here. First, in light of the nature of the claims and the amounts in issue, is this case frivolous and is it an example of what is wrong with litigation and, specifically, class actions? Second, are the fees counsel seek reasonable and appropriate in light of what they have accomplished?

With regard to the first issue, it is difficult to tell from the record whether the plaintiff's case has merit. As previously noted, the court found the plaintiff had identified sufficient facts to survive initial motions. In class actions, that frequently means the case settles before trial, and before extensive discovery. Certainly, plaintiff's case had sufficient merit to survive those initial motions, and sufficient merit to warrant a settlement, even if the defendants' primary motivation in settling was to avoid the time, expense, distraction and publicity of further proceedings.

With regard to the second issue, the fee counsel seeks does not appear reasonable. It does not appear to reflect reasonable value for the services rendered. In this case, the principal service counsel rendered was to identify the claim. Counsel might have rendered additional service and produced additional value by working to demonstrate that this claim was more than an identification of an inadvertent error, an inadvertent error that caused at most nominal damages to a large number of people. Counsel failed to do that and has failed to demonstrate how it is that identifying that claim would justify an award of over a million dollars.

### 8. *Cross check against the loadstar award method*

The court does not have available to it all of the information necessary to make a precise loadstar calculation. For example, the formula requires multiplying the number of hours reasonably expended by a billing professional by a reasonable hourly rate for that professional, which is the prevailing market rate for that professional in the community. In this case, plaintiff's counsel has submitted information on their standard billing rates, but has not sought to establish that their rates are consistent with rates in the market place. They have not, for example, set out information on the education and experience of the associates, law clerks or legal assistants. Nor have they offered information on comparable billing rates for these professionals in the market.

The rates identified by counsel are $350 to $300 an hour for a partner, $200 to $135 for associates, $100 an hour for law clerks and $90 to $70 an hour for legal assistants. The court has gathered together and pub-

lished information on rates for similar professionals in two other cases. *See In re Marvel Entertainment Group, Inc.,* 234 B.R. 21 (D.Del.1999); *Steiner,* 835 F.Supp. at 779. It appears plaintiff's counsels' rates are consistent with and in the range of these rates. The court will, therefore, assume they are reasonable.

The court has reviewed the nature of the work done as reported by counsel and finds that the descriptions of the work done as reported in counsel's summary are adequate. In addition, the hours as reported by counsel do not appear to be excessive or inefficient in light of the work done.

This information suggests that the lodestar as reported by counsel of $169,402.50 for Edelman, Combs & Latturner, fairly reflects hours reasonably expended by reasonable hourly rates. Plaintiff's local counsel, Mr. O'Day, has filed a paper reporting that his billing rate is $185.00 an hour and that he has worked 104 hours on this matter, for a loadstar of $19,240.00. These numbers appear to be reasonable. Consequently, the combined loadstar for plaintiff's counsel is $188,642.50

Counsel seek a total award of $1,285,200 in attorneys fees and costs. If we deduct out the out of pocket expenses as reported by Edelman, Combs & Latturner of $30,930.15 and $196.69 as reported by Mr. O'Day, the fees sought are $1,254,073.16. This number represents a multiplier of 6.65 times their loadstar. This multiplier seems high.

Perhaps the best approach in this case would be to start with a multiplier of 3 and look back through various factors to see whether they suggest a higher or lower multiplier would be appropriate. A multiplier of 3 is a good starting point, as it rewards counsel with a substantial incentive to take on this type of case, an incentive that offsets the risks counsel face of taking on a case where there may be no recovery. Two factors suggest a higher multiplier may be appropriate. First, counsel appear to have worked relatively efficiently. If we want to encourage this, we should reward counsel who work efficiently with a relatively higher multiplier. Second, through this investment of $188,642.50 in billable hours, counsel have recovered a substantial amount for the class, perhaps as much as $4,536,266.91. Increasing the multiplier will increase the reward to counsel for obtaining this substantial recovery and recognize that counsel will have an incentive to maximize the recovery for the class.

A number of factors suggest a lower multiplier may be appropriate. First, as noted above, this case was not particularly complex, either legally or factually. Second, while counsel have achieved a settlement for a substantial amount, they have not demonstrated outstanding or extraordinary skill.

■ Balancing these factors suggests that a multiplier of 3 would be appropriate. Three times the loadstar of $188,642.50 is $565,927.50.

In the typical loadstar analysis, the court would add to this amount to an amount to reimburse counsel for out of pocket expenses. As noted above, in their motion, plaintiff's counsel had sought a combined or lump sum award for fees and costs based on a percentage of the total recovery for the class and had not sought a separate award for costs. In their submissions on time and expenses counsel list out of pocket expenses of $30,930.15, but failed to provide the detailed information such as receipts and invoices the court typically finds necessary in evaluating a motion for reimbursement of out of pocket expenses. *See, e.g., Steiner,* 835 F.Supp. at 781. For example, counsel's summary lists items

such as "TASA $3025.50," "U.S., Treasury $808.16," and "travel expense $448.62," without describing what these expenses were for and what the basis was for the billing. Without this information, the court is not in a position to made a judgment on the reasonableness of each of the costs reported by counsel.

### 9. *Conclusion as to a reasonable fee*

In light of the factors and analysis set out above, the court finds that the fee of $1,282,200 agreed upon by plaintiff's counsel and defendants is unreasonably high and that an award for fees of $566,000 is reasonable, as it fairly compensates counsel for the total recovery for the class and for the time and skill counsel invested in achieving the settlement agreement. This figure sets counsel's compensation in the range of 12.5% of the maximum recovery for the class, which is lower than the 22% sought by counsel, as it reflects a discount based on the lack of complexity of the issues in the case and concerns the court has expressed about counsel's diligence. An award of $566,000 provides for a multiplier of 3 times the hours counsel have invested in this matter. The court finds this is a fair and generous multiplier.

Additionally, the court will award $24,000 in costs to plaintiff's counsel. If counsel would like to submit additional papers justifying the costs originally requested, the court will consider modifying the cost award.

### III. *SUMMARY AND CONCLUSION*

The court finds the settlement entered into by the parties is fair, reasonable and adequate and will, therefore, enter an order approving it. The court rejects the parties proposed award for fees and costs for class counsel and will enter an order directing defendants to pay counsel a total of $590,000 for their fees and costs in this matter.